Christopher J. King
WSB 7-4532
PO Box 552
Worland, WY 82401
(307) 347-9801
chris@wyoattorney.com

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

BONNIE SMITH,

Plaintiff,

-v-

BUFFALO BILL MEMORIAL
ASSOCIATION, KELLY JENSEN,
PETER SEIBERT, REBECCA WEST,
COREY ANCO, NATHAN HORTON and
MELISSA HILL,

Defendants.

21-cv-00092

## RESPONSE TO MOTION TO DISMISS

COMES NOW, the Plaintiff herein, Bonnie Smith, by and through her attorney, Christopher J. King and hereby files her *Response to Motion to Dismiss* as follows:

1.     On the 8th day of July, 2021 the Defendants filed a *Motion to Dismiss* pursuant to Federal Rule of Civil Procedure 12(b)(6).

2.     In determining whether a complaint fails to state a claim for relief under Rule 12(b)(6), the Court is to accept as true all well-pleaded factual allegations and construe them in the light most favorable to the Plaintiff.   *Alvarado v. KOB-TV, LLC,* 493 F.3d 1210, 1215 (10th Cir. 2007).

3.     The Defendants have set forth the following in their brief on page 4 of 23:

The standard to survive a motion to dismiss in federal court is well known: a complaint must contain sufficient factual allegations to state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "While the 12(b)(6) standard does not require that Plaintiff establish a prima facie case in her complaint, the elements of each alleged cause of action help to determine whether Plaintiff has set forth a plausible claim." *Khalik v. United Air Lines,* 671 F.3d 1188, 1192 (10th Cir. 2012). A claim if facially plausible when the allegations support a reasonable inference that the defendant is liable. *Mayfield v. Bathards,* 826 F.3d 1252, 1255 (10th Cir. 2016). This standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). A complaint that offers nothing more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do." *Id.* "Nor does a complaint suffice if it tenders 'naked assertions' devoid of 'further factual enhancement." *Id.*

This analysis by the Defendants as to the requirements this Court must weigh when resolving a Motion to Dismiss pursuant to Rule 12(b)(6) is spot on and does not require the Plaintiff to assert additional analysis simply citing other cases.

4.     For purposes of this response and contrary to the conclusory statements of Counsel for the Defendant that somehow the pleadings do not demonstrate a claim upon which relief may be granted the following allegations all must be considered true and every allegation must be construed in the light most favorable to the Plaintiff (the numbers set forth below correspond with the numbered paragraphs in the *Complaint*):

13.     That the Plaintiff began working for the BBMA approximately May 11, 2010 and continued to work for the Defendant until March 28th, 2019.

14.     Plaintiff is a member of a protected group-female.

15.     The Defendant employs approximately 80 people of which approximately half are or were female at the time the Plaintiff was terminated.

16.     That the Plaintiff held several positions of employment during her tenure with the Defendant.  At the time of discharge, she was a Curatorial Assistant working in the Draper Department.  This position began at an hourly rate of $12.50 an hour and the Plaintiff had an annual salary of $41,000.00 at the time of termination.

17.     That Charles Preston PhD was the direct supervisor of the Plaintiff until December 31st, 2018 upon his retirement.  During the last part of the year of 2018 there was a change over at the BBMA wherein a new CEO by the name of Peter Siebert was hired and Rebecca West was named an advocate whose responsibilities were time clock approvals.  The Plaintiff and others at the BBMA were all told she was not a supervisor and Rebecca West confirmed she was not a supervisor.

18.     That the BBMA terminated the Plaintiffs' employment upon allegations made by Rebecca West, Corey Anco, Nathan Horton, Kelly Jensen and Melissa Hill and for the claimed reasons set forth in Exhibit 1 hereto.  It stated that there was an attachment to the Disciplinary Action Form but that was not attached at the time and to date it is not known what document the Defendant is referencing.

19.     At the time of the Plaintiff's termination Rebecca West was represented as an interim supervisor, however, this was the first, and only time it was relayed.

20.     Rebecca West was currently the curator of the Plains Indian Museum and she would attend meetings as a representative of the curatorial department.  She is not the Executive Director.

21.     The individual who terminated the Plaintiff's employment was Rebecca West a temporary acting supervisor who had a known and stated vendetta against the Plaintiff.

22.     That it is not believed that the new CEO knew of the personal vendetta against the Plaintiff at the time.

23.     That the reasons given to the Plaintiff's termination were a complete fabrication.   The Plaintiff instead upon information and belief was terminated for the following reasons:

a.      The Plaintiff informed that violations had occurred related to the handling of artifacts in the Defendant's possession.   This included the Plaintiff notifying the proper federal agencies related to the incorrect handling of artifacts.   Once it was found out that the Plaintiff had done what she was supposed to do this became a retaliatory firing.

b.      The Defendant has a history of both age and gender discrimination. The Plaintiff while employed experienced both, which shall more fully set forth herein.

c.      Personal vendetta from the interim supervisor (Rebecca West) of the Plaintiff which was not disclosed to the newly hired CEO.

24.     That the Plaintiff has appended hereto the Employee Handbook as Exhibit 3.  The Employee Handbook outlines both expectations and procedures and policies.  It is believed this is the document referenced by the Defendant's termination notice.

25.     That the Plaintiff has been in complete compliance with the Employee Handbook at all times.

26.     That during her employment a male-employee with less experience (actually no experience) was hired and promoted above the Plaintiff.

27.     That it was obvious that the male employee had no experience and did not do his job correctly.   When this was discussed the Plaintiff was retaliated against.   This was due to the Plaintiff being a female.

28.     Plaintiff has never had poor performance reviews.

29.     Plaintiff has very little interaction with volunteers as such the reason given for termination of a complaint being made by a volunteer was shocking to the Plaintiff. The Plaintiff spoke to the few individuals she does have contact with, and it was learned that there was no complaint made by a volunteer.

30.     Plaintiff does not have a lot of interaction with other employees and the allegation of the Plaintiff spending an exorbitant amount of time while on the clock chatting/gossiping was also shocking to the Plaintiff.  The Plaintiff investigated this and also found out this was not reported.

31.     The Plaintiff has always stayed in her area of work and has performed her work tremendously throughout her employment at BBMA.  The allegation that she had "contempt" and was not staying in her "lane" of work was inexplicable.  This was further investigated by the Plaintiff and found that the entire allegation came from the interim supervisor (Rebecca West and the other individuals individually named herein) who do not like the Plaintiff and who made up the allegation to terminate her.

32.     Corey Anco was a younger inexperienced male employee who had never held a position until he was hired by BBMA.  Corey Anco's grief with the Plaintiff stems from the following:

        a.      Reports were Made about complete ineptitude and lack of care in his work product.

        b.      Reports were made about his mishandling of artifacts and damaging sampling techniques which had to be reported to the appropriate federal agencies.

        c.      Reports were made about Corey Anco meeting with a looter at the Marquette Mammoth Site.   When this was discovered it subjected BBMA to possible federal charges.

        d.      After Corey Anco met with the looter at the Marquette Site he showed pictures to the Plaintiff of various artifacts.  The Plaintiff reported this to Kierson Crume the Archeologist for the BLM at the Cody Office.

33.     Melissa Hill is in charge of the Raptor Program.  It was previously believed that Melissa Hill had a good reputation.  However, it was learned that once she found an opportunity to try and terminate the Plaintiff, she engaged in conspiring with the other named individuals herein to make false allegation against the Plaintiff to have her fired.

34.     Nathan Horton was a Co-Worker of the Plaintiff.   The Plaintiff had previously told Check Preston, PhD and Terry Harley, Director of Human Resources about being uncomfortable around Nathan Horton because he was aggressive, hostile and made a hostile work environment.   This was all reported and then it was learned that because of these allegations Nathan Horton conspired with the other named individuals to make false allegations against the Plaintiff.

35.     The Plaintiff has never done or taken any action outside her job description. Rebecca West again made up allegations that were not accurate to state that the Plaintiff was not acting in a professional manner.

36.     The Plaintiff has numorous letters of commendation and was never disciplined until Rebecca West became the interim supervisor.

37.     The Plaintiff's concerns have been brought to the supervisors in the chain of command.   Each and every supervisor up to the Director of BBMA has by their actions or inactions approved or ratified the termination of the Plaintiff.

38.     Plaintiff was passed over for advancement due to her age / gender.

39.     BBMA hired a younger male who had no experience and put him in a position that he was not qualified for.

40.     This was done because the Plaintiff was a female and not as young.

41.     That the job performance of the younger male was very substandard and included the destruction of federally owned material due to inappropriate sampling and not following policy or protocol.

42.     That when it was reported by the Plaintiff to the proper federal agencies and within the BBMA the Plaintiff was retaliated against and terminated.

43.     The actions of BBMA and the Supervisors constituted a hostile work environment.

44.     That the conduct was sufficiently severe that a reasonable person in Plaintiff's position would have found the work environment to be hostile.

45.     That the Plaintiff's termination letter references not "staying in her lane" and acting professional.  Both of these allegation are related to the Plaintiff's actions in making a proper report.

46.     That the allegations set forth in paragraphs 33-40 above were reported.  The conduct of an inexperienced younger male who had allowed destructive sampling on federally owned property was brought to the attention of the Plaintiff's supervisors.

47.     That the Employee Handbook outlines both expectations and procedures and policies.   The Plaintiff has been inn complete compliance with the Employee Handbook at all times.

48.     That the Plaintiff was terminated from her employment related to this retaliation.

49.     The actions of Management of BBMA in retaliating against the Plaintiff and in causing termination from employment for engaging in protected activities were conducted knowing that they violated federal law governing retaliation.

50.     That BBMA has in the past faced legal action for retaliating against Plaintiffs in similar circumstances in eluding for retaliating related to sex discrimination, sexual harassment, age discrimination, reporting missing artifacts, theft and for reporting proper reporting.

51.     That BBMA has used an employee handbook and additional documents to create an implied employment contract with the Plaintiff.   Exhibit 3 (Employee Handbook) and Exhibit 4 (Supervisor's Handbook).

52.     That BBMA in setting forth the reasons for termination identified violations of policy.

53.     That BBMA through both the use of employment documents, handbooks, and other documents and through the use of identifying violations related to the termination has taken this matter outside of "at will" employment and created an employment contract and have violated their own policies and procedures.

56.     That upon termination from BBMA it was learned that the Plaintiff's character and work were being discussed in a negative way to the other organizations.

57.     That the Plaintiff was engaged to give discussions and further speak about research she has done.

58.     That the Plaintiff learned that Rebecca West and/or other individuals at BBMA had discussed her termination.

59.     BBMA along with the individuals identified herein took the Plaintiff's photos without her knowledge or permission and posted them publicly around the museum with warnings that the Plaintiff has been banned from the BBMA property.

5.     The argument that has been set forth by the Defendants in this matter for their Motion to Dismiss is basically they want this Court to believe that the majority of the allegations set forth above are not specific enough to state a claim and thus warrant dismissal.  They rely on the case of *Khalik v. United Air Lines,* 671 F.3d 1188 (2012) or the cases discussed in *Khalik* for a majority of their argument.  Unfortunately, as is often the case when case law is cited to the Defendants have failed to actually discuss the case and instead have picked specific citations from *Khalik* to support their position when the actual case does not.

6.     In *Khalik* there is an expanded discussion as to whether or not the *Twombly* case created a heightened standard of pleading.  The Court set forth as follows:

> We review a district court's dismissal under Federal Rule of Civil Procedure 12(b)(6) de novo. *Teigen v. Renfrow,* 511 F.3d 1072, 1078 (10th Cir.2007). Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Recently, the Supreme Court clarified this pleading standard in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009): to withstand a Rule 12(b)(6) motion to dismiss, a complaint must contain enough allegations of fact, taken as true, "to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570, 127 S.Ct.

1955. A plaintiff must "nudge [his] claims across the line from conceivable to plausible" in order to survive a motion to dismiss. *Id.*

The Court explained two principles underlying the new standard: (1) when legal conclusions are involved in the complaint "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to [those] conclusions," *Iqbal,* 129 S.Ct. at 1949, and (2) "only a complaint that states a plausible claim for relief survives a motion to dismiss,"

*id.* at 1950. Thus, mere "labels and conclusions" and "a formulaic recitation of the elements of a cause of action" will not suffice. *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955. Accordingly, in examining a complaint under Rule 12(b)(6), we will disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable.

There is disagreement as to whether this new standard requires minimal change or whether it in fact requires a significantly heightened fact-pleading standard.2 *Compare In re Travel Agent Comm'n Antitrust Litig.,* 583 F.3d 896, 911 (6th Cir. 2009) (construing *Twombly* as requiring a plaintiff to plead enough specific facts "to raise a reasonable expectation that discovery will reveal evidence"), *with id.* at 912 (Merritt, J., dissenting) (stating that the majority has "seriously misapplied the new standard by requiring not simple `plausibility,' but by requiring the plaintiff to present at the pleading stage a strong probability of winning the case"), *and Tamayo v. Blagojevich,* 526 F.3d 1074, 1083 (7th Cir. 2008) (stating that *Twombly* "did not . . . supplant the basic notice-pleading standard"). We noted in *Gee v. Pacheco,* 627 F.3d 1178, 1185 (10th Cir.2010), that "the plausibility standard has been criticized by some as placing an improper burden on plaintiffs," where a chief criticism "is that plaintiffs will need discovery before they can satisfy plausibility requirements when there is asymmetry of information, with the defendants having all the evidence."

We recently stated this new standard is a "refined standard." *Kansas Penn Gaming, LLC v. Collins,* 656 F.3d 1210, 1214 (10th Cir.2011). In applying this new, refined standard, we have held that plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs `have not nudged their claims across the line from conceivable to plausible.'" *Robbins v. Oklahoma,* 519 F.3d 1242, 1247 (10th Cir.2008) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955). Further, we have noted

that "[t]he nature and specificity of the allegations required to state a plausible claim will vary based on context." *Kansas Penn,* 656 F.3d at 1215; *see also Iqbal,* 129 S.Ct. at 1950 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."). Thus, we have concluded the *Twombly/Iqbal* standard is "a middle ground between heightened fact pleading, which is expressly rejected, and allowing complaints that are no more than labels and conclusions or a formulaic recitation of the elements of a cause of action, which the Court stated will not do." *Robbins,* 519 F.3d at 1247 (internal quotation marks and citations omitted).

*Id.* At 1191 - 1192

7.    In other words, what the Defendant is attempting to do is exactly what was rejected.  They are attempting to basically make the Plaintiff prove that she has a high likelihood of winning a case which has expressly been rejected as the requirement for pleading as set forth above.  Moreover it is important to note that within the same case there is a significant and specific citation the deserves additional emphasis from that set forth above as this has been ignored by the Pleadings of the Defendants in this matter:

In other words, Rule 8(a)(2) still lives. There is no indication the Supreme Court intended a return to the more stringent pre-Rule 8 pleading requirements. *See Iqbal,* 129 S.Ct. at 1950 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era. . . ."). And in fact, the Supreme Court stated in *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), a pre-*Twombly* case, that "[a] requirement of greater specificity for particular claims is a result that must be obtained by the process of amending the Federal Rules, and not by judicial interpretation." *Id.* at 515, 122 S.Ct. 992 (internal quotation marks omitted). Thus, as the Court held in *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007), which it decided a few weeks after *Twombly,* under Rule 8, "[s]pecific facts are not necessary; the statement need only `give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Id.* at 93, 127 S.Ct. 2197 (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 (alteration in original)); *see also al-Kidd v. Ashcroft,* 580 F.3d 949, 977 (9th Cir.2009)

> ("*Twombly* and *Iqbal* do not require that the complaint include all facts necessary to carry the plaintiff's burden.").

*Id.* At 1192.

8.     The simple fact is that the pleading requirements have been met.   At this time, prior to discovery, there is no doubt from the pleadings that the Defendants have been put on notice what the claims are and the grounds upon which it rests.

9.     Even so, it is important to note that the Plaintiff in this matter has gone well beyond the general conclusory statements that the Defendant wishes to complain of.  The *Khalik* case set forth when looking at some additional pleadings that are needed the following when faced with a situation such as in *Khalik*:

> While we do not mandate the pleading of any specific facts in particular, there are certain details the Plaintiff should know and could properly plead to satisfy the plausibility requirement. For instance, Plaintiff should know when she requested FMLA leave and for what purpose. She should know who she requested leave from and who denied her. She should know generally when she complained about not receiving leave and when she was terminated. She should know details about how Defendant treated her compared to other non-Arabic or non-Muslim employees. She should know the reasons Defendant gave her for termination and why in her belief those reasons were pretextual. She should know who grabbed her by the arm, what the context for that action was, and when it occurred. She should know why she believed that action was connected with discriminatory animus. She should know who she complained to about the discrimination, when she complained, and what the response was. She should know who criticized her work, what that criticism was, and how she responded. But in fact, Plaintiff offers none of this detail. To be sure, we are not suggesting a court necessarily require each of the above facts. But a plaintiff must include some further detail for a claim to be plausible. Plaintiff's claims are based solely on the fact that she is Muslim and Arab-American, that she complained about discrimination, that she complained about the denial of FMLA leave, and that Defendant terminated her. Without more, her claims are not plausible under the Twombly/Iqbal standard.[4]

*Id.* At 1194

10.     In this matter the Plaintiff has complained of specific actions such as the following (again the paragraph numbers below are the same as set forth in the *Complaint)*:

17.     That Charles Preston PhD was the direct supervisor of the Plaintiff until December 31st, 2018 upon his retirement.  During the last part of the year of 2018 there was a change over at the BBMA wherein a new CEO by the name of Peter Siebert was hired and Rebecca West was named an advocate whose responsibilities were time clock approvals.  The Plaintiff and others at the BBMA were all told she was not a supervisor and Rebecca West confirmed she was not a supervisor.

18.     That the BBMA terminated the Plaintiffs' employment upon allegations made by Rebecca West, Corey Anco, Nathan Horton, Kelly Jensen and Melissa Hill and for the claimed reasons set forth in Exhibit 1 hereto.   It stated that there was an attachment to the Disciplinary Action Form but that was not attached at the time and to date it is not known what document the Defendant is referencing.

19.     At the time of the Plaintiff's termination Rebecca West was represented as an interim supervisor, however, this was the first, and only time it was relayed.

21.     The individual who terminated the Plaintiff's employment was Rebecca West a temporary acting supervisor who had a known and stated vendetta against the Plaintiff.

22.     That it is not believed that the new CEO knew of the personal vendetta against the Plaintiff at the time.

23.     That the reasons given to the Plaintiff's termination were a complete fabrication.  The Plaintiff instead upon information and belief was terminated for the following reasons:

a.     The Plaintiff informed that violations had occurred related to the handling of artifacts in the Defendant's possession.  This included the Plaintiff notifying the proper federal agencies related to the incorrect handling of artifacts.  Once it was found out that the Plaintiff had done what she was supposed to do this became a retaliatory firing.

b.     The Defendant has a history of both age and gender discrimination. The Plaintiff while employed experienced both, which shall more fully set forth herein.

c.     Personal vendetta from the interim supervisor (Rebecca West) of the Plaintiff which was not disclosed to the newly hired CEO.

26.    That during her employment a male-employee with less experience (actually no experience) was hired and promoted above the Plaintiff.

27.    That it was obvious that the male employee had no experience and did not do his job correctly.  When this was discussed the Plaintiff was retaliated against.  This was due to the Plaintiff being a female.

28.    Plaintiff has never had poor performance reviews.

29.    Plaintiff has very little interaction with volunteers as such the reason given for termination of a complaint being made by a volunteer was shocking to the Plaintiff. The Plaintiff spoke to the few individuals she does have contact with, and it was learned that there was no complaint made by a volunteer.

30.    Plaintiff does not have a lot of interaction with other employees and the allegation of the Plaintiff spending an exorbitant amount of time while on the clock chatting/gossiping was also shocking to the Plaintiff.  The Plaintiff investigated this and also found out this was not reported.

29.    Plaintiff has very little interaction with volunteers as such the reason given for termination of a complaint being made by a volunteer was shocking to the Plaintiff. The Plaintiff spoke to the few individuals she does have contact with, and it was learned that there was no complaint made by a volunteer.

30.     Plaintiff does not have a lot of interaction with other employees and the allegation of the Plaintiff spending an exorbitant amount of time while on the clock chatting/gossiping was also shocking to the Plaintiff.  The Plaintiff investigated this and also found out this was not reported.

31.     The Plaintiff has always stayed in her area of work and has performed her work tremendously throughout her employment at BBMA.  The allegation that she had "contempt" and was not staying in her "lane" of work was inexplicable.  This was further investigated by the Plaintiff and found that the entire allegation came from the interim supervisor (Rebecca West and the other individuals individually named herein) who do not like the Plaintiff and who made up the allegation to terminate her.

32.     Corey Anco was a younger inexperienced male employee who had never held a position until he was hired by BBMA.  Corey Anco's grief with the Plaintiff stems from the following:

         a.     Reports were Made about complete ineptitude and lack of care in his work product.

         b.     Reports were made about his mishandling of artifacts and damaging sampling techniques which had to be reported to the appropriate federal agencies.

         c.     Reports were made about Corey Anco meeting with a looter at the Marquette Mammoth Site.   When this was discovered it subjected BBMA to possible federal charges.

         d.     After Corey Anco met with the looter at the Marquette Site he showed pictures to the Plaintiff of various artifacts.  The Plaintiff reported this to Kierson Crume the Archeologist for the BLM at the Cody Office.

33.     Melissa Hill is in charge of the Raptor Program.  It was previously believed that Melissa Hill had a good reputation.  However, it was learned that once she found an opportunity to try and terminate the Plaintiff, she engaged in conspiring with the other named individuals herein to make false allegation against the Plaintiff to have her fired.

34.    Nathan Horton was a Co-Worker of the Plaintiff.   The Plaintiff had previously told Check Preston, PhD and Terry Harley, Director of Human Resources about being uncomfortable around Nathan Horton because he was aggressive, hostile and made a hostile work environment.   This was all reported and then it was learned that because of these allegations Nathan Horton conspired with the other named individuals to make false allegations against the Plaintiff.

35.    The Plaintiff has never done or taken any action outside her job description. Rebecca West again made up allegations that were not accurate to state that the Plaintiff was not acting in a professional manner.

36.    The Plaintiff has numorous letters of commendation and was never disciplined until Rebecca West became the interim supervisor.

37.    The Plaintiff's concerns have been brought to the supervisors in the chain of command.  Each and every supervisor up to the Director of BBMA has by their actions or inactions approved or ratified the termination of the Plaintiff.

41.    That the job performance of the younger male was very substandard and included the destruction of federally owned material due to inappropriate sampling and not following policy or protocol.

42.    That when it was reported by the Plaintiff to the proper federal agencies and within the BBMA the Plaintiff was retaliated against and terminated.

43.    The actions of BBMA and the Supervisors constituted a hostile work environment.

44.    That the conduct was sufficiently severe that a reasonable person in Plaintiff's position would have found the work environment to be hostile.

45.    That the Plaintiff's termination letter references not "staying in her lane" and acting professional.  Both of these allegation are related to the Plaintiff's actions in making a proper report.

46.     That the allegations set forth in paragraphs 33-40 above were reported.  The conduct of an inexperienced younger male who had allowed destructive sampling on federally owned property was brought to the attention of the Plaintiff's supervisors.

47.     That the Employee Handbook outlines both expectations and procedures and policies.   The Plaintiff has been inn complete compliance with the Employee Handbook at all times.

48.     That the Plaintiff was terminated from her employment related to this retaliation.

49.     The actions of Management of BBMA in retaliating against the Plaintiff and in causing termination from employment for engaging in protected activities were conducted knowing that they violated federal law governing retaliation.

50.     That BBMA has in the past faced legal action for retaliating against Plaintiffs in similar circumstances in eluding for retaliating related to sex discrimination, sexual harassment, age discrimination, reporting missing artifacts, theft and for reporting proper reporting.

56.     That upon termination from BBMA it was learned that the Plaintiff's character and work were being discussed in a negative way to the other organizations.

57.     That the Plaintiff was engaged to give discussions and further speak about research she has done.

58.     That the Plaintiff learned that Rebecca West and/or other individuals at BBMA had discussed her termination.

59.     BBMA along with the individuals identified herein took the Plaintiff's photos without her knowledge or permission and posted them publicly around the museum with warnings that the Plaintiff has been banned from the BBMA property.

11.     Allegations such as those set forth in the forty paragraphs above are in direct contradiction to the argument made by the Defendant and these paragraphs are in direct compliance with the pleading requirements herein.

12.     The argument set forth that Count I of the Plaintiff's *Complaint* does not set forth a plausible claim for relief as argued by the Defendants simply does not hold up and should be denied.

13.     The Defendants try to argue that the *Complaint* does not alleged that she is a member of a protected class (being 40 years or older).  Again, this is simply not true.  The Plaintiff has alleged age discrimination.    She is part of a protected class and the Defendants at least are aware that one must be 40 years or older.   While the Complaint does not specifically state that she is 40 years or older this is not a requirement for pleading and following the Defendant's logic it would then not be enough to state that one is a member of a protected class being female because they have female genitals which would be a requirement for being female.

14.     The next argument made by the Defendants is related to how a Plaintiff can prove a violation of Title VII by following the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L.ed.2d 668 (1973).   However, this does not even apply at this point.   The Plaintiff is not required in her initial pleading to prove the violation.   Nor is this appropriate for a Motion to Dismiss.   Thankfully, the Defendants acknowledge this when they state "While the 12(b)(6) standard does not require that Plaintiff establish a prima facie case in her complaint…" pg. 6 of 26 of Defendant's *Brief in Support of Motion to Dismiss* citing to *Morman v. Campbell Cty. Mem'l Hosp.,* 632 Fed. App'x 927, 933 (10th Cir. 2015).

15.     The next argument is that the Plaintiff has somehow failed to exhaust her administrative remedies.   The Defendant is confusing the initial filed documents with what is generated by the EEOC for signature to start the process and have failed to provide all of the information to this Court for this Court to be able to make a determination.    In fact, there was 67 pages provided to the EEOC with the initial complaint.  Exhibit "1".  Once this was done the EEOC generates a generic form for the complainant to sign which is the initial charge.  Exhibit "2".

16.     The Defendants have failed to engage in discovery at this point and probably are not aware of the total allegations that were submitted to the EEOC.   Interestingly the Defendants' allegations that the EEOC was not put on notice of all of the allegations and therefore the Plaintiff somehow failed to exhaust her administrative remedies is a non-starter as a copy of the draft complaint was also provided.

17.     The argument presented by the Defendants is premature in nature as they do not have a copy of the entire file that was presented to the EEOC and in turn, their argument related to the case law presented by the Defendant is premature as the Courts did not dismiss based on an EEOC generated charge.   It may have been from the original charge presented by the Plaintiff with all of the information.     The cases cited are all distinguishable based on this fact.   As the Defendants argument they set forth on page 3 of 23 that "[A]" document central to the Plaintiff's claim and referred to in the complaint may be considered in resolving a motion to dismiss, at least where the documents authenticity is not in dispute."   Page 3 of 23 (omitting citations as the Defendants have already cited to the cases).   The Defendants are correct.   However, where they are incorrect is stating that the EEOC generated charge to start the case is the relied upon document by the Plaintiff.   The Document relied on by the Plaintiff is that set forth on Exhibit "1" appended hereto.

18.     The next argument presented by the Defendants is that "To the extent that count I is asserted against any individual, the claim fails as a matter of law and should be dismissed as to the individual defendants."   Again, this is premature in nature.   The Defendants have been put on notice of what the allegations are.    In addition, the individuals have been identified as follows within the Pleadings (numbers correspond to the numbered paragraphs of the Complaint):

8.     The individual Defendants Peter Seibert and Rebecca West are employed by BBMA and are residents of Wyoming and were at the relevant times, supervisors or temporary supervisors over the Plaintiff.

18.    That the BBMA terminated the Plaintiff's employment upon allegations made by Rebecca West, Corey Anco, Nathan Horton, Kelly Jensen and Melissa Hill and for the claimed reasons set forth in Exhibit 1 hereto.

19.    At the time of the Plaintiff's termination Rebecca West was represented as an interim supervisor, however, this was the first, and only time it was relayed.

20.    Rebecca West was currently the curator of the Plains Indian Museum and she would attend meetings as a representative of the curatorial department.  She is not the Executive Director.

21.    The individual who terminated the Plaintiff's employment was Rebecca West a temporary acting supervisor who had a known and stated vendetta against the Plaintiff.

32.    Corey Anco was a younger inexperienced male employee who had never held a position until he was hired by BBMA.  Corey Anco's grief with the Plaintiff stems from the following:

    a.    Reports were Made about complete ineptitude and lack of care in his work product.

    b.    Reports were made about his mishandling of artifacts and damaging sampling techniques which had to be reported to the appropriate federal agencies.

    c.    Reports were made about Corey Anco meeting with a looter at the Marquette Mammoth Site.   When this was discovered it subjected BBMA to possible federal charges.

    d.    After Corey Anco met with the looter at the Marquette Site he showed pictures to the Plaintiff of various artifacts.  The Plaintiff reported this to Kierson Crume the Archeologist for the BLM at the Cody Office.

33.    Melissa Hill is in charge of the Raptor Program.  It was previously believed that Melissa Hill had a good reputation.  However, it was learned that once she found an

opportunity to try and terminate the Plaintiff, she engaged in conspiring with the other named individuals herein to make false allegation against the Plaintiff to have her fired.

34.     Nathan Horton was a Co-Worker of the Plaintiff.   The Plaintiff had previously told Check Preston, PhD and Terry Harley, Director of Human Resources about being uncomfortable around Nathan Horton because he was aggressive, hostile and made a hostile work environment.   This was all reported and then it was learned that because of these allegations Nathan Horton conspired with the other named individuals to make false allegations against the Plaintiff.

19.   This matter goes to the earlier argument of the Defendants and basically what is being requested is what has already been rejected is that each and every factual allegation must be pled and the Plaintiff must prove she has a high likelihood of winning to survive a Motion to Dismiss.   This is not the standard no matter how many times the Defendants attempt to make it the standard.

20.   The arguments set forth above apply to the argument set forth by the Defendants that Count II does not state a plausible claim for relief and the proceeding nineteen (19) paragraphs along with all sub-paragraphs and references to the Complaint are incorporated herein by this reference.

21.   The argument set forth by the Defendants that Count III "Breach of Contract," does not state a plausible claim for relief.  Is inaccurate for a variety of reasons.  To begin with, the Defendants are correct that "State Law Claims before a federal court on supplemental jurisdiction are governed by state law."   *Time Warner Entm't Co., L.P. v. Everest Midwest Licensee, L.L.C.,* 381 F.3d 1039, 1044 (10th Cir. 2004).   Where the Defendants are incorrect is their analysis and the statement that Exhibits 3 and 4 to the Complaint do not create an implied employment contract… simply because Counsel for the Defendant states that they do not.   Counsel for the Defendant is not the trier of fact in this matter.  As the Defendants note, in limited circumstances "an employment handbook or personnel policies, letters of employments, performance evaluations and an employer's

course of dealing may supply terms for an implied-if-fact employment contract." *Finch v. Farmers Co-op. Oil Co. of Sheridan,* 2005 WY 41, 109 P.3d 537, 541 (Wyo. 2005). The Court in this matter must be able to review not only the policies attached to the Complaint but through the Course of testimony, discovery and depositions the Court must take into account not only any disclaimer, the policy and procedure handbook along with personnel policies, letters of employments, performance evaluations and an employer's course of dealing as set forth above.  Without any additional information the Defendants are stating that this Court should ignore all other evidence that may be developed and simply because there is a disclaimer state that nothing could bring the Plaintiff's employment into an implied employment contract.  This is not what the case law states.

22.    The next argument presented by the Defendants is that the "Defamation of Character," does not state a plausible claim for relief."   The Defendants argument is basically as follows:

     a.    A Plaintiff must prove special damages to successfully claim defamation.

     b.    The Complaint does not identify who was discussing her "character and work."

     c.    The content of those negative discussions or with what "other organizations" these "negative" discussions were had.

     d.    It claims that Rebecca West "discussed her termination" but gives no description of what she said or to whom she said it.

     e.    Plaintiff was in fact, terminated; thus, discussing that truth cannot give rise to a defamation claim.

23.    The Defendants argument again is as set forth above:

In other words, what the Defendant is attempting to do is exactly what was rejected. They are attempting to basically make the Plaintiff prove that she has a high likelihood of winning a case which has expressly been rejected as the requirement for pleading as set forth above.

In other words, Rule 8(a)(2) still lives. There is no indication the Supreme Court intended a return to the more stringent pre-Rule 8 pleading requirements. *See Iqbal,* 129 S.Ct. at 1950 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era. . . ."). And in fact, the Supreme Court stated in *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), a pre-*Twombly* case, that "[a] requirement of greater specificity for particular claims is a result that must be obtained by the process of amending the Federal Rules, and not by judicial interpretation." *Id.* at 515, 122 S.Ct. 992 (internal quotation marks omitted). Thus, as the Court held in *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007), which it decided a few weeks after *Twombly,* under Rule 8, "[s]pecific facts are not necessary; the statement need only `give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Id.* at 93, 127 S.Ct. 2197 (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 (alteration in original)); *see also al-Kidd v. Ashcroft,* 580 F.3d 949, 977 (9th Cir.2009) ("*Twombly* and *Iqbal* do not require that the complaint include all facts necessary to carry the plaintiff's burden.").

*Id.* At 1192.

24.     The next argument is that Count VI, "Intentional Infliction of Emotional Distress," does not state a plausible claim for relief."  The argument set forth above in paragraph 23 again applies.  The Plaintiff does not have to prove her case in her initial Complaint.  The Plaintiff does not have to plead with specificity each and every allegation.  That is simply not the standard.   This is a premature argument and should not be granted as it is not required for the Plaintiff to set forth each and every allegation in the *Complaint* and it is not required for her to prove her damages in the initial *Complaint*.


        WHEREFORE the Plaintiff requests that this Court deny the *Motion to Dismiss* and the *Brief in Support of Motion to Dismiss* and for such other and further relief as the Court deems meet and proper in the premises.

Dated this 29th day of July, 2021.

APEX Legal, P.C.

/s/ *Christopher J. King*_____
Christopher J. King
WSB 7-4532
PO Box 43
Cheyenne, WY 82003
(307) 347-9801
(307) 333-0285 fax
chris@wyoattorney.com

CERTIFICATE OF SERVICE

I, Christopher J. King, hereby certify that on the 29th day of July, 2021 the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system and a true and correct copy of the foregoing document was placed in the U.S. Mail, first-class postage affixed and addressed as follows:

Amanda F. Esch
And
Catherine M. Young
PO Box 43
Cheyenne, WY 82003

A copy of the document was also emailed to the following email address:
amanda@davisandcannon.com
catherine@davisandcannon.com

/s/ Christopher J. King_____.



# State of Wyoming
# Department of Workforce Services

Labor Standards
5221 Yellowstone Road
Cheyenne, Wyoming 82002
307.777.7261 ▪ Fax: 307.777.5633
www.wyomingworkforce.org



**Mark Gordon**
Governor

**Robin Sessions Cooley**
Director

December 23, 2019

Bonnie L. Smith
c/o Christopher J. King, Esq.
Apex Legal, P.C., A Wyoming Law Firm
P.O. Box 552
Worland, WY 82401

RE:   Charge of Discrimination – Buffalo Bill Memorial Association d/b/a Buffalo Bill Center of
the West

Dear Ms. Smith:

The information necessary to file a Charge of Discrimination was entered on the enclosed form.
The areas marked with a red "x" must be completed.

Please be advised that the intake questionnaire you submitted does not constitute a verified
complaint under state law.  To be timely filed under <u>State</u> law, it is necessary for us to have a
signed, **notarized Charge of Discrimination** (verified complaint) received in our office on or
before <u>September 28, 2019.</u>

You may either personally deliver your charge to our office or send it by U.S. mail or by
facsimile.  If you have any questions, please feel free to contact us.

Sincerely,

Kelly Roseberry
Labor Standards Manager

KR/cer
Enclosures

## Exhibit 1

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | [X] FEPA | |
| | [X] EEOC | **32K-2020-00037** |

| **Wyoming Fair Employment Program** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| **Ms. Bonnie L. Smith** | **(310) 308-2300** | |

| Street Address | City, State and ZIP Code |
|---|---|
| **1231 Chalk Road, Powell, WY 82435** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **BUFFALO BILL MEMORIAL ASSOCIATION** | **201 - 500** | **(307) 578-4089** |

| Street Address | City, State and ZIP Code |
|---|---|
| **D/B/A Buffalo Bill Center Of The West,  720 Sheridan Avenue,  Cody, WY 82414** | |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

| DISCRIMINATION BASED ON *(Check appropriate box(es).)* | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| | Earliest — Latest |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

[ ] RACE  [ ] COLOR  [X] SEX  [X] RELIGION  [ ] NATIONAL ORIGIN
[X] RETALIATION  [X] AGE  [ ] DISABILITY  [ ] GENETIC INFORMATION
[ ] OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **05-01-2018**    Latest **03-28-2019**

[ ] CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

**PERSONAL HARM**: I was subjected to harassment and intimidation. I was subjected to different terms and conditions of employment. I was discharged.

**RESPONDENT'S REASON FOR ADVERSE ACTION:** Complaints from others, not staying in my lane, and insubordination.

**DISCRIMINATION STATEMENT**: I believe I was discriminated against on the basis of my sex, female, my age, 52                          , my religion, Other, and retaliated against in violation of the Title VII of the Civil Rights Act of 1964, as amended, and the Age Discrimination in Employment Act of 1967, as amended. Specifically:

1. I am a member of the protected groups, female, over the age of forty, and religion (Other);
2. I was satisfactorily performing my job;
3. I was subjected to sex, age, and religious harassment;
4. The harassment complained of affected a term, condition, or privilege or employment and was so pervasive as to alter the working conditions of employment and create an abusive working environment;
5. I was subjected to different terms and conditions of employment;
6. Other similarly situated employees outside my protected groups were not subjected to similar terms and conditions of employment in similar circumstances;

7. I engaged in protected opposition to Title VII prohibited discrimination;
8. Contemporaneous with or subsequent to my protected activity I suffered an adverse employment action;
   a. I was discharged on March 28, 2019.
9. There exists a causal connection between my protected activity and my employer's decision to take adverse employment action against me; and
10. My name may be used in the processing of this charge.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| _____          _____<br>*Date*                              *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

GENERAL INTAKE QUESTIONNAIRE
PROGRAM

RECEIVED *91*

DEC 09 2019

LABOR - CHEY

**CHEYENNE OFFICE**
Labor Standards
1510 E. Pershing Boulevard
West Wing, Room 150
Cheyenne, WY 82002
(307) 777-7261 FAX (307) 777-5633

*[handwritten note on sticky note]* latest = ?
3/28/19
6 mos = ?
9/28/19
300 days = ?
1/22/20

**CASPER OFFICE**
Labor Standards
851 Werner Court
Suite 121
Casper, WY 82601
307) 235-3679 FAX (307) 235-3688

**DATE:** 10 / 7 /19

Please answer the following questions telling us briefly why you believe you have been discriminated against by your employer or potential employer. After you complete this questionnaire, submit the **signed** document to THE NEAREST OFFICE at the address noted above.

UNDER STATE LAW, YOU HAVE SIX (6) MONTHS FROM THE LAST DISCRIMINATORY ACT IN WHICH TO FILE A VERIFIED COMPLAINT WITH OUR OFFICE, AND **300 DAYS** FROM THE LAST DISCRIMINATORY ACT IN WHICH TO FILE UNDER FEDERAL LAW. IF YOU HAVE ALREADY FILED WITH A STATE AGENCY, OR IF YOU ARE COMPLAINING ABOUT SOMETHING WHICH HAPPENED TO YOU OVER 300 DAYS AGO, STOP AND CONTACT A COMPLIANCE OFFICER BEFORE PROCEEDING FURTHER WITH THIS QUESTIONNAIRE.

NAME: Donnie                              L.                              Smith
          (First)                    (Middle Initial)                    (Last)

MAILING ADDRESS 1231 Chalk Road

EMAIL ADDRESS: wyomingarchaeologist@gmail.com

CITY Powell     STATE WY  ZIP CODE 82435  COUNTY Park

TELEPHONE NUMBER (Include Area Code): WORK ( ) N/A      HOME (310) 308-2300

I prefer to be contacted at [ ] WORK  [✓] HOME Days Any      Time Any

YOUR SOCIAL SECURITY #                    YOUR SEX [ ] MALE [✓] FEMALE

YOUR DATE OF BIRTH                    YOUR AGE 52

YOUR RACE [✓] White  [ ] Black  [ ] American Indian  [ ] Other
          [ ] Asian/Pacific Islander [ ] Alaskan Native

YOUR NATIONAL ORIGIN [ ] Mexican [ ] Hispanic [ ] East Indian [✓] Other

Please provide the name of a person at a different address whom we can contact if we are unable to reach you.

NAME Christian Silco      RELATIONSHIP Son

ADDRESS 2931 Zion Ln #308 TELEPHONE (Area Code) (307) 254-4735

1

CITY Casper
82609

STATE WY    ZIP CODE

Name of Intake Officer (if known) _____

Have you filed any previous EEOC charges [ ] Yes [X] No
If "yes", identify your EEOC Charge Number(s)  1) _____  2) _____

Approximate Date(s) you filed your prior EEOC charge(s)  1) _____  2) _____

**IDENTIFY THE EMPLOYER (BUSINESS NAME) WHOM YOU BELIEVE DISCRIMINATED AGAINST YOU**

NAME Buffalo Bill Memorial Assoc. DBA Buffalo Bill Center of the West

ADDRESS (location where you actually worked) 720 Sheridan Ave

CITY Cody                          STATE WY  ZIP CODE 82414

COUNTY Park                  TELEPHONE NO. (Include Area Code) (307) 578 - 4089

NUMBER OF EMPLOYEES NATIONWIDE ~80 NUMBER OF EMPLOYEES IN WYOMING ~80 - 300

TYPE OF BUSINESS Museum _____

If the employer has a separate Headquarters Office, please include the name and address, and telephone number, if known.

HEADQUARTERS OFFICE (If different from where you actually worked)

ADDRESS: _____

_____

Telephone Number: ( ) _____

Contact Person if known (example: Director, (Human Resources)) Terry Harley

If a different employer, or union organization is involved in the matter you believe was discriminatory, identify by:

NAME _____

ADDRESS (where you actually worked)

_____

CITY _____  STATE _____  ZIP CODE _____

COUNTY _____  TELEPHONE NO. (Area Code)
_____

NUMBER OF EMPLOYEES: _____  TYPE OF BUSINESS _____

3

**EMPLOYMENT DATA** (Complete as many items as you can)

Date Hired _May 11, 2010_  Current Job Title/Salary _Curatorial ASSISTANT $_

Job Title/Salary at time of alleged discrimination _Curatorial ASSISTANT $_

Name and title of current immediate supervisor _Transition Period - Rebecca WEST ADVOCATE_

Is there a union?[ ] Yes [X] No  If so, name the union (including local #), give address and local phone number. _____

Have you filed a union grievance related to the allegation of discrimination? [ ] Yes [X] No  If so, what happened?

_____

**FOR THOSE ACTIONS THAT YOU WISH TO INCLUDE IN THE CHARGE:**

1.      The date (month, day, year) of the EARLIEST alleged discrimination is:
        _May 2015_

        The date of the LATEST (MOST RECENT) alleged discrimination is:

        _____

2.      If known, identify by name and job title, the individual(s) you believe discriminated against you:

Name _Rebecca WEST_          Job Title _Advocate for Curation_

The Wyoming Labor Standards Division enforces laws which prohibit discrimination on the basis of Race, Sex, Religion, Color, Age, National Origin, Ancestry, and Handicap.  The law also prohibits an employer from retaliating against an employee who alleges any of the types of discrimination, or who participates in an investigation.  **CHECK THE BOXES YOU BELIEVE ARE THE BASIS FOR YOUR CHARGE.**

**IDENTIFY THE BASIS OF YOUR CHARGE:**

[ ] Race     [ ] Color     [ ] Pregnancy     [X] Sex     [X] Age (40+)     [X] Retaliation

[ ] National Origin     [ ] Ancestry     [X] Religion (specify) _HR ASKED IF I Am WICCA_

[ ] Disability (specify) _____

*(If you check Disability, you must complete the ADA Intake Questionnaire also.  Contact the nearest Labor Standards Office in your area listed on page 1.)*

4

**TYPE OF ACTION(S) TAKEN AGAINST YOU (Please list actual date):**

| **Terminated** | **Denied** | **Treated Differently** |
|---|---|---|
| **Date** | **Date** | **Date** |

3/28 Fired (discharged)

_____ Employment

multiple Harassed

_____ Laid Off

8/2017 Promotion

_____ Unequal Pay

_____ Forced to Quit/Retire

_____ Transfer

_____ Demoted

_____ Resigned

_____ Reinstatement

_____ Maternity Leave

_____ Constructively Discharged

_____ Recall

_____ Discipline

_____ Training

_____ Maternity Benefits

Other actions, if any (please specify): verbally attacked, hazed, intentional interference with job duties, publicly humiliated, hostile actions.

What reason(s) were given by the employer for the actions taken against you?

3/28 contempt, working with agencies & sending an email to my advisory board. 8/2017 No reason was offered. Multiple dates of harassment I was told I deserved it based on something I had said in 2015.

State the specific reason(s) you believe the actions taken against you were the result of discrimination you identified above:

Annual reviews have been excellent for the entire time I've worked. There a new director/advocate hired & w/in 3 months who has made comments about people over 50 cruising, waiting for retirement. Male employee w/ less experience promoted over older, female

Do you know of any other reason(s) which may lead to the actions(s) taken against you?

No

Indicate any direct evidence (statements or documents) which would help prove what you are saying:

I have Emails, Documents, screenshots, and witnesses

5

List the name(s), job title, race, sex, age, of those persons who were treated the same, more favorably, or less favorably than you:

| Name & Job Title | Race/Sex/Age | Same | More Favorably | Less Favorably |
|---|---|---|---|---|
| Corey Ando Assist. Curator | W/m/32 | | ✓ | |
| Nathan Hector, Lab Assist | W/m/32 ? | | ✓ | |

State the name, address, telephone number, and a description of the information which can be provided by any witness(es) you believe can provide evidence to support your charge: (i.e., an eye witness that actually saw and/or heard the events leading to the actions taken against you.)

| Name and Address | Telephone No. (Include Area Code) (Home) (Work) | Description of Information Each Witness Can Provide |
|---|---|---|

a. Patricia Lord, 1020 E Street, Beaning, CA 91600, (312) 218-2331 Witnessed & Experienced Similar Discrimination & Termination

b. Gina Schneider, Bucking Horse Ranch, 32 Bucking Horse Rd, Cody, 82414, (307) 250-1986. Witnessed & Experienced Similar Disc

c. Susan Notarines, Cody, WY 82414 (300) 849-0771. Witness

(If additional space is needed, use the reverse side of this page).
Name, title, address and phone number of your representative is:

Union Representative, if any _____ N/A

Attorney, if any (include contact information): Christopher King Esg.

Have you attempted to resolve your problem by discussing the matter with someone in management?
[X] Yes [ ] No   If so, give the name and title of the person, state what happened, and when:
Terry Harley & Rebecca West & Peter Siebert: 1/15/19, 1/17/19, 2/8/19, 2/21/19, 3/28/19. my concerns were dismissed and ultimately I was terminated

If discharged, have you applied for unemployment insurance? [X] Yes [ ] No

Were you awarded unemployment compensation? [X] Yes [ ] No   If so, when?
If no, why not? _____

6

Do you have a copy of the Referee's decision regarding your claim?   [X] Yes [  ] No

## SETTLEMENT INFORMATION

Specifically, what would you want the employer to do in order to resolve this charge?

Terminate the offenders/liars, compensation, & public Apology

What is the least you would be willing to accept and that the employer (Respondent) may offer in order to resolve your charge?

See Above

If you are still employed by the employer you are claiming discriminated against you.
  What is your current rate of pay? $ _____ (circle one)
  (per hour)          (per week)          (per month)     (per year)

  Number of hours worked _____ (circle one)
  (per week)          (per month)     (per year)
  (Submit a copy of your latest pay stub, if possible.)

If you are no longer employed by the employer you are claiming discriminated against you:

  What was your rate of pay when you left $ _____ (circle one)
  (per hour)          (per week)          (per month)          (per year)

  Number of hours worked  40+  (circle one)
  (per week)          (per month)     (per year)
  (Submit a copy of your latest pay stub, if possible.)

Have you gotten a job somewhere else?  [  ] Yes [X] No   If yes, who is your current employer?

Name _____

Address _____

Telephone No.(Include Area Code) _____

When did you begin working with your current employer?  DATE: _____

  What is your current rate of pay? $_____ (circle one)
  (per hour)          (per week)          (per month)          (per year)

  Number of hours worked _____ (circle one)
  (per week)          (per month)     (per year)
  (Submit a copy of your latest pay stub, if possible).

*Signature of Potential Charging Party*

Conny Smith

*Date Signed*

10/7/19

7

APEX LEGAL, P.C.
A Wyoming Law Firm

Click here to enter a date.

**Sent via U.S. Mail**

Labor Standards
1510 E. Pershing Boulevard
West Wing, Room 150
Cheyenne, WY 82002

RE:    Complaint

To Whom it May Concern,

I represent Bonnie Smith and Emily Zalewski and they have both brought complaints to my office related to their former employment at the museum in Cody, Wyoming. I have enclosed both of their original complaints with this letter. I have also enclosed a copy of the draft complaint that I worked up when we tried to resolve Bonnie Smith's matter.

We look forward to the processing of these matters. I have numerous contacts and additional information as does my clients. However, we did not want to flood everything at once.

If you have any questions or concerns do not hesitate to contact me. Until then I remain,

Sincerely,

Christopher J. King

Christopher J. King    ◊    P: 307-347-9801  ·  F: 307-333-0285  ·  E: chris@wyoattorney.com
1112 Robertson Avenue,  PO Box 552,  Worland, WY 82401

RECEIVED
DEC 09 2019
LABOR - CHEY

Christopher J. King
WSB# 7-4532
PO Box 552
Worland, WY 82401
(307) 347-9801 p
(307) 333-0285 f
chris@wyoattorney.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| BONNIE SMITH, | |
| Plaintiff, | Civil Action No. |
| -v- | |
| BUFFALO BILL MEMORIAL ASSOCIATION, PETER SEIBERT, REBECCA WEST, COREY ANCO, NATHAN HORTON and MELISSA HILL. | |
| Defendant. | |

## COMPLAINT

COMES NOW the Plaintiff herein, Bonnie Smith, by and through her attorney, Christopher J. King and for her *Complaint* states and alleges as follows:

### Jurisdiction, Venue and Related Matters

1. The Court has jurisdiction of the federal claims herein pursuant to 28 U.S.C. § 1331, 1337 and 1343.

2. Plaintiff is alleging violations of her rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.

3. This Court has jurisdiction over declaratory actions pursuant to 28 U.S.C. § 2201 & 2202.

4. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

5. Venue is proper under 28 U.S.C. § 1391. The violations alleged herein and the factual allegations pertaining to Plaintiff's state law claims occurred within the State of Wyoming or were directed toward the Plaintiff during the course of her employment in Wyoming.

6. The Plaintiff is a bona fide resident of Park County, Wyoming and has been for several years last past.

7. The Defendant, Buffalo Bill Memorial Association ("BBMA"), is a licensed business in the State of Wyoming with its primary purpose being educational, not for profit. It owns assets and physical facilities and has its principal place of operation in Park County, Wyoming.

8. The individual Defendants Peter Seibert and Rebeca West are employed by BBMA and are residents of Wyoming, and were at all relevant times, supervisors or temporary supervisors over the Plaintiff.

### Jurisdictional Requirements for Title VII Claim

9. On or about _____, Plaintiff timely filed a charge of discrimination with the Wyoming Department of Labor, within 300 calendar days after one or more of the alleged unlawful employment practices occurred.

10. In her allegations the Plaintiff alleged discrimination on the basis of sex and age along with retaliation.

11.     On or about _____, the Plaintiff received a notice of a Right to Sue Letter from the EEOC.

12.     This complaint followed within 90 days receipt of that notice.

## General Factual Allegations

13.     That the Plaintiff began working for the BBMA approximately May 11, 2010 and continued to work for the Defendant until March 28th, 2019.

14.     Plaintiff is a member of a protected group – female.

15.     The Defendant employs approximately 80 people of which approximately half are or were female at the time the Plaintiff was terminated.

16.     That the Plaintiff held several positions of employment during her tenure with the Defendant. At the time of discharge she was a Curatorial Assistant working in the Draper Department. This position began _____ and the Plaintiff had an annual salary of _____ at the time of termination.

17.     That Charles Preston Ph.D was the direct supervisor of the Plaintiff. During the first part of the year of 2019 there was a change over at the BBMA wherein a new CEO by the name of Peter Siebert was hired and Rebecca West was named as an Advocate whose responsibilities were time management, invoice approvals and administrative work. The Plaintiff and others at the BBMA were all told that she was not a supervisor and Rebecca West confirmed she was not a supervisor.

18.     That the BBMA terminated the Plaintiff's employment upon allegations made by Rebecca West, Corey Anco, Nathan Horton and Melissa Hill and for the claimed reasons set forth in Exhibit 1 hereto. It stated that there was an attachment to the Disciplinary Action Form but that was not attached at the time and to date it is not known what document the Defendant is referencing.

19.     At the time of the Plaintiff's termination Rebecca West was represented as an interim supervisor, however, this was the first, and only time, that this was relayed.

20.     Rebecca West is currently the curator of the Plains Indian Museum and she also attends meetings as a representative of the curatorial department.

21.     The individual who terminated the Plaintiff's employment was Rebecca West a temporary acting supervisor who had a known and stated vendetta against the Plaintiff.

22.     That it is not believed that the new CEO knew of the personal vendetta against the Plaintiff.

23.     That the reasons given for the Plaintiff's termination were a complete fabrication. The Plaintiff instead upon information and belief was terminated for the following reasons:

   a. The Plaintiff informed that violations had occurred related to the handling of artifacts in the Defendant's possession. This included the Plaintiff notifying the proper federal agencies related to the incorrect handling of artifacts. Once it was found out that the Plaintiff had done what she was supposed to do this became a retaliatory firing.

    b. The Defendant has a history of both age and gender discrimination. The Defendant while employed experienced both which shall be more fully set forth herein.

    c. Personal Vendetta from the interim supervisor (Rebecca West) of the Plaintiff which was not disclosed to the newly hired CEO.

24.    That the Plaintiff has appended hereto the Employee Handbook. The Employee Handbook outlines both expectations and procedures and policies. It is believed this is the document referenced by the Defendant's termination notice.

25.    That the Plaintiff has been in complete compliance with the Employee Handbook at all times.

26.    That during her employment a male employee with less experience (actually no experience) was hired and promoted above the Plaintiff.

27.    That it was obvious that the male employee had no experience and did not do his job correctly. When this was discussed the Plaintiff was retaliated against. This was due to the Plaintiff being a female.

28.    Plaintiff has never had poor performance reviews.

29.    Plaintiff has very little interaction with volunteers as such the reason given for termination of a complaint being made by a volunteer was shocking to the Plaintiff. The Plaintiff spoke to several individuals who she does have contact with and it was learned that there was no complaint made by a volunteer.

30.    Plaintiff does not have a lot of interaction with other employees and the allegation of the Plaintiff spending an exorbitant amount of time while on the clock chatting / gossiping was also shocking to the Plaintiff. The Plaintiff investigated this and found that this also was not reported.

31.     The Plaintiff has always stayed in her area of work and has performed her work tremendously throughout her employment at BBMA. The allegation that she had disdain and was not staying in her "lane" of work was inexplicable. This was further investigated by the Plaintiff and found that the entire allegation came from the interim supervisor (Rebecca West and the other individuals individually named herein) who do not like the Plaintiff and who made up the allegation to terminate her.

32.     Corey Anco was a younger inexperienced male employee who had never held a position until he was hired by BBMA. Corey Anco's grief with the Plaintiff stems from the following:

    a. Reports were made about complete ineptitude and lack of care in his work product.

    b. Reports were made about his mishandling of artifacts and damaging sampling techniques which had to be reported to the appropriate federal agencies.

    c. Reports were made about Corey Anco meeting with a looter at the Marquet Mammoth Site. When this was discovered it subjected BBMA to possible federal charges.

    d. After Corey Anco met with the looter at the Marquet Mammoth Site he shows pictures to the Plaintiff of various artifacts. The Plaintiff reported this to Kierson Crume the Archeologist for the BLM at the Cody office.

33.     Melissa Hill is in charge of the Raptor Program. It was previously believed that Melissa Hill had a good reputation. However it was learned that once she found an opportunity to try and terminate the

Plaintiff she engaged in conspiring with the other named individuals herein to make false allegations against the Plaintiff to have her fired.

34.     Nathan Horton was a Co-Worker of the Plaintiff. The Plaintiff had previously told Chuck Preston, Ph.D. about being uncomfortable around Nathan Horton because he was aggressive, hostile and made a hostile work environment. This was all reported and then it was learned that because of these allegations Nathan Horton conspired with the other named individuals to make false allegations against the Plaintiff.

35.     The Plaintiff has never done or taken any action outside of her job description. Rebecca West again made up allegations that were not accurate to state that the Plaintiff was not acting in a professional manner.

36.     The Plaintiff has numerous letters of commendation and was never disciplined until Rebecca West became the interim supervisor.

37.     That the Plaintiffs concerns have been brought to the supervisors in the chain of command. Each and every supervisor up to the Director of BBMA has by their actions or inactions approved or ratified the termination of the Plaintiff.

## COUNT I. Discrimination because of Age / Gender

38.     Plaintiff was passed over for advancement due to her age / gender.

39.     BBMA hired a younger male who had no experience and put him in a position that he was not qualified for.

40.     This was done because the Plaintiff was a female and not as young.

41.     That the job performance of the younger male was very substandard and included the destruction of federally owned material due to inappropriate sampling and not following policy or protocol.

42.     That when this was reported by the Plaintiff to the proper federal agencies and within the BBMA the Plaintiff was retaliated against and terminated.

43.     The actions of BBMA and the supervisors constituted a hostile work environment.

44.     That the conduct was sufficiently severe that a reasonable person in Plaintiff's position would have found the work environment to be hostile.

45.     That the Plaintiff's termination letter references not "staying in her lane" and acting unprofessional.   Both of these allegations are related to the Plaintiff's actions in making a proper report.

### COUNT II.  Retaliation for Reporting

46.     That the allegations set forth in paragraphs 33 – 40 above were reported.   The conduct of an inexperienced younger male who had allowed destructive sampling on federally owned property was brought to the attention of the Plaintiff's supervisors.

47.     That the Plaintiff was terminated from her employment related to this retaliation.

48.     The actions of Management of BBMA in retaliating against the Plaintiff and in causing termination from employment for engaging in protected activities were conducted knowing that they violated federal law governing retaliation.

49.     That BBMA has in the past faced legal action for retaliating against Plaintiffs in similar circumstances including for retaliating related to sex discrimination, sexual harassment and age discrimination.

## COUNT III.     Breach of Contract

50.     That BBMA has used an employee handbook and additional documents to create an implied employment contract with the Plaintiff.

51.     That BBMA in setting forth the reasons for termination identified violations of policy.

52.     That BBMA through both the use of employment documents, handbooks and other documents and through the use of identifying violations related to the termination has taken this matter outside of "at-will" employment and created an employment contract.

53.     That BBMA in terminating the employee violated the employee's employment contract.

54.     That BBMA has caused damages to the Plaintiff in the termination of her employment.

## COUNT IV.  Theft

55.     That upon termination from BBMA there were multiple items left that were personal of nature in the office spaces of the Plaintiff.

56.     That this included hard drives with valuable information and other items.

57.     That there has been a demand made to return the hard drives and other items.

58.     That to date BBMA has not returned the Plaintiff's personal property.

## COUNT V. Defamation of Character

59.     That upon the termination from BBMA it was learned that the Plaintiff's character and work were being discussed in a negative way to other organizations.

60.     That the Plaintiff was engaged to give discussions and further speak about research she has done.

61.     That the Plaintiff learned that Rebecca West and/or other individuals at BBMA had discussed her termination even though the Plaintiff was still allowed to speak at the event.

62.     That these actions are in direct retaliation and have severely damaged the reputation of the Plaintiff within her professional capacity and damaged her ability to find work.

## COUNT VI. Intentional Infliction of Emotional Distress

63.     That the actions taken by the employees of the BBMA named personally herein and then ratified and approved by BBMA were all willful, done purposely and with malice aforethought.

64.     That the Defendants' conduct herein is extreme, outrageous and manipulative.

65.     That the Defendants' conduct has caused severe emotional distress to the Plaintiff.

## Additional Allegations

66.     All of the actions of BBMA, Rebecca West and Peter Siebert were intentional and conducted with reckless disregard of the consequences and under such circumstances and conditions that a reasonable person

would know, or have reason to know, that such conduct would, in a high decree of probability result in substantial harm to another.

67.     The Defendant Corporation should be responsible for punitive damages under this complaint because the actions complained of were either 1) the actions of the corporation itself 2) the actions of a supervisor acting in a managerial capacity and in the scope of employment, or 3) the actions complained of by the supervisor were ratified by the company in failing to respond to the Plaintiff's complaints.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in her favor and against the Defendant and award her:

1. Back Pay;
2. Front Pay;
3. Other future damages;
4. Liquidated damages as allowed by law;
5. Pecuniary and non-pecuniary compensatory damages;
6. Other compensatory damages including economic losses allowed by law;
7. Non-economic damages for pain, suffering, loss of enjoyment of life;
8. Punitive or exemplary damages for Plaintiff's state law claims and Title VII claims;
9. Attorneys' fees and costs in the action including expert witness fees as allowed by law.

DATED this ___ day of _____, 2019

_____
Christopher J. King
WSB 7-4532



## DISCIPLINARY ACTION FORM

| NAME | Bonnie Smith | DATE of NOTICE | 3-28-19 |
|---|---|---|---|
| DEPARTMENT | Draper | POSITION | Curatorial Assistant |

### Type of Violation

| | | |
|---|---|---|
| ☐ Attendance | ☐ Unsatisfactory Performance | ☐ Other: _____ |
| ☒ Insubordination | ☒ Violation of Company Policies/Procedures | |
| ☒ Gross Misconduct | ☐ Willful Damage to Company Property | |

### Action Taken

| | | |
|---|---|---|
| ☐ Counseling/Verbal Warning | ☐ Written Warning | ☐ Final Warning |
| ☐ Suspension | ☒ Discharge | |

### Description of Violation

| Date of Incident | On-going | Time | _____ AM PM |
|---|---|---|---|

Bonnie, it has come to our attention that you have not followed the expectations outlined in the attached document you agreed to and signed on 8-24-18. The document confirmed the Center's promise to investigate any complaints made about matters concerning the Draper Museum. We have received multiple complaints lately, thus we conducted a thorough investigation. What we found is you have spent an exorbitant amount of time (while on the time clock) chatting/gossiping with employees about your discontent (or as one employee stated, your contempt towards) with fellow Draper employees. management, and with the Center in general. You have also spent time distracting others with non-related work issues. Unfortunately, a complaint was even made by a volunteer – s/he could not get the work done in the time s/he had to share with the Center because you were distracting them. Your actions are a direct violation of the second bullet in the document you signed.

It has also been reported and witnessed that you have not been staying in your 'own lane'. An example of this is your distain for how fellow Draper colleagues are conducting the work assigned specifically to them and your communication of these issues to uninvolved parties. If you felt a co-worker was not performing his/her job well, it was your responsibility to go to your immediate supervisor or HR with that complaint, rather than discussing it with various employees within the museum or agencies outside the museum. Bonnie, you have not stayed focused on your own responsibilities and have made it very difficult for others. This is a direct violation of the 1st bullet in the document.

Finally, you have been insubordinate towards your immediate supervisor. Shortly (2 days) after your previous supervisor retired, the Draper staff was instructed to funnel everything through your interim supervisor. You did not do this on multiple occasions. For example, you took it upon yourself to send the Draper Board an email updating them on the Draper happenings. You failed to copy your interim supervisor, Peter Seibert or anyone else on that email. Your supervisor sent the update compiled by Draper staff as discussed with Draper staff in meetings and by email to the board chair as it was her responsibility. The chair distributed the information to the Draper Board per her decision and authority as Chair. The email contained information that violates the confidentiality of the hiring process and did not contain accurate information regarding the hiring process. Your email undermined and violated everything the Draper team is trying to accomplish as a team. This was not your responsibility and it was not well received. You have also tried to work around your supervisor to get things you want. You have gone to at least three individuals other than your supervisor to get funding. This is also highly inappropriate. This speaks to the third bullet... you have not behaved in a professional manner.

Due to these on-going infractions of the agreement, your employment with the Center of the West is terminated effective immediately.

REVISED May1, 2018


EXHIBIT
1

Please note, you will not be allowed back into the Center for any reason until further notice. In addition, you are no longer and administrator to any of Buffalo Bill Center of the West social media including our main page, the Draper Face Book, Instagram and any other social media you once had access to. These venues belong to the Center of the West and you are no longer allowed to post on any of them.

**Employee Comments**

_I have received a copy of the above notice. Having read this notice and been given a chance to discuss it with my department manager, I acknowledge that I know of the DTR rules and requirements involved._

EMPLOYEE SIGNATURE _____   DATE _____

MANAGER SIGNATURE _____   DATE _____

HR DIRECTOR SIGNATURE                           DATE

REVISED May1, 2018



EXHIBIT

2.25.2016

Advisory Boards

Executive Assistant

Board of Trustees

Board Standing Committees

Administrative and Compliance Manager

Executive Director & CEO

Director of Finance and Planning-CFO

Human Resource Manager

Accounting Manager

Staff (3 FT)

Information Technology Manager

Staff (2 FT)

Director of Revenue and Enterprise
- Museum Store Manager
  - Staff (3 FT, 2 PT)
- Kitchen Supervisor
  - Staff (1 FT)
- Custom Events Manager
- Firearms Records Specialist
  - Staff (1 FT)
- Director of Public Relations
- Electronic Communication Manager
- Graphics Manager
  - Graphics Designer

Director of Development - CDO
- Development Officer (3 FT)
- Membership Supervisor
- Donor Relations Manager
- Database Manager
- Special Events Coordinator
- Administrative Assistant

Director of Museum Services
- Conservator
- Registrar
  - Staff (1 PT)
- Collections Manager
- Exhibition Production Manager
- Preparator (1 PT)

Acting Dir. of Ops, Security Manager
- Staff (6FT, 10 PT)
- Maintenance Manager
  - Staff (2 FT, 1 PT)
- Carpenter
- Operating Engineer
- Custodial Supervisor
  - Staff (6 FT)
- Grounds Supervisor

Director of Interpretive Education
- Interpretive Specialist – Natural History
- School Services Coordinator
- Educational Web Content Creator

Director of Curatorial and Interpretive Education (vacant)
- Buffalo Bill Museum Curator/Papers
  - Staff (3 FT)
- Cody Firearms Museum Curator
  - Staff (1 FT, 1 PT)
- Plains Indian Museum Curator
  - Staff (1 FT)
- Whitney Western Art Museum Curator
  - Staff (1 FT, 1 PT)
- Draper Natural History Museum Curator
  - Staff (4 FT)
- Director, McCracken Research Library
  - Staff (4 FT, 1 PT)

- FT – Current - 80
- PT – Current - 24
- 2015 FT Hours - 168,678
- 2015 PT Hours - 25,738
- 2015 FTE for FT + PT = 93
- 2015 Seasonal Employees total - 130
- 2015 Seasonal Hours total - 45,500
- FTE for Seasonal (season 5/1/15-10/30/15) - 20

Note: Organization Chart does not include seasonal staff

**BUFFALO BILL
CENTER
OF THE WEST**



7/01/2017



**BUFFALO BILL
MUSEUM**



**CODY
FIREARMS MUSEUM**



Employee Handbook | PART 1



**DRAPER
NATURAL HISTORY MUSEUM**

# Policies



**WHITNEY
WESTERN ART MUSEUM**



**PLAINS INDIAN
MUSEUM**



**MCCRACKEN
RESEARCH LIBRARY**

# Index

| Policies | Page |
|---|---|
| Accident Reporting | 4 |
| Accommodation of Disabilities | 4 |
| Alcoholic Beverages | 5 |
| At-Will Employment | 3 |
| Background Checks | 5 |
| Code of Ethics  Confidentiality; Personal Collecting; Publication Royalties; Sensitive Issues; Use of Center's Name & Property; Staff/Trustee Communication; Art Dealing; Appraisals & Authentications; Gifts; Outside Employment; Contracts with Employees; Staff Assistance and Referrals | 5 |
| Computer Use and Internet Policy | 15 |
| Drug Free Workplace | 16 |
| Equal Employment Opportunity | 16 |
| Family Medical Leave | 17 |
| High-Profile Visitors | 22 |
| Map of the Center | 41 |
| Military Leave Policy | 22 |
| Mission Statement | 23 |
| Non-Smoking Policy | 23 |
| Pay Categories | 23 |
| Pay Policies | 24 |
| Pay Types | 25 |
| Performance Evaluation | 26 |
| Personal Appearance Policy | 26 |
| Personnel Management | 26 |
| Pest Management Policy / Includes Food and Drink Policy | 27 |
| Plagiarism Policy | 30 |
| Rules for Visitors | 32 |
| Safety Procedures | 32 |
| Security | 34 |
| Sexual Harassment Policy | 36 |
| Values | 37 |
| Vision Statement | 37 |
| Weapons and Threats of Violence | 38 |
| Whistleblower's Policy | 39 |

## At-Will Employment

This employee information handbook is a way to collect our employment ideas and policies into one place. This manual is designed to outline general policies of the Center that are currently in place.

## THIS MANUAL REPLACES ALL OTHER POLICIES AND MANUALS PROVIDED TO EMPLOYEES EARLIER.

Nothing contained in this manual is to be considered as an employment contract. Policies, definitions, benefits and any other information, written or unwritten, may be changed at any time and at the Center's sole discretion.

**EMPLOYEES HAVE THE RIGHT TO RESIGN THEIR EMPLOYMENT AT ANY TIME, FOR ANY REASON OR NO REASON. THE CENTER RETAINS A SIMILAR RIGHT TO DISCONTINUATION OF THE EMPLOYMENT OF ANY EMPLOYEE, AT ANY TIME, FOR ANY REASON OR NO REASON.**

**I FURTHER UNDERSTAND THAT MY EMPLOYMENT STATUS IS AT-WILL. I HAVE THE RIGHT TO RESIGN MY EMPLOYMENT AT ANY TIME, FOR ANY REASON OR NO REASON. I ALSO UNDERSTAND THAT THE BUFFALO BILL MEMORIAL ASSOCIATION'S BUFFALO BILL CENTER OF THE WEST (HEREINAFTER REFERRED TO AS THE CENTER) RETAINS A SIMILAR RIGHT TO DISCONTINUATION OF MY EMPLOYMENT, AT ANY TIME, FOR ANY REASON OR NO REASON.**

## Accident Reporting

When anyone while at the Center is injured or involved in an accident, the event must be reported to Security immediately. When a visitor has an accident or appears to be ill, the employee who observes the problem should tell the injured person that the employee will get help for him/her immediately. The employee should contact the Security Department immediately, then return to the visitor and wait for Security to appear. Once a Security Department member is on the scene, that person takes charge of the situation and assists the visitor.

If an employee is injured at work or becomes ill due to a work-related illness, he/she is required to report the injury or illness immediately to his/her supervisor. In addition, the Security Department should be notified immediately so they can assist, if help is needed getting medical attention for the employee, and to collect information for an accident report.

The first priority is to ensure that the employee either receives treatment or is out of danger.  The second priority is that information is collected for an accident report.  Also, as soon as practical, after the employee receives treatment, the employee needs to meet with the Human Resources Manager to complete the report of accident for Workers' Compensation. This will start the claim process to cover the cost of treatment, medical supplies, prescriptions and other items covered through Workers' Compensation.

We would like to have reports of all injuries, even if the employee believes that no medical treatment will be necessary. Sometimes a minor injury causes subsequent symptoms which require treatment. The Center wants to be informed from the time the injury occurs.

Following treatment for the accident, an employee must:
   a. Complete a workers' compensation report of injury as required.
   b. Keep scheduled medical appointments.
   c. Return to work when cleared by his/her treating physician. Employees returning must provide certification from a physician indicating they will be able to work satisfactorily and safely.  The Center will accommodate releases to work for light duty or with medical restrictions when this is possible.

## Accommodation of Disabilities

The Center will provide reasonable accommodation as required by federal or state law to enable a qualified applicant to perform the essential functions of the job which he or she is seeking and to enable a qualified employee with a disability to perform the essential functions of a job currently held.

Modifications or adjustments may be required in the work environment, in the manner or circumstances in which the job is performed, or in employment policies. Our goal is to allow an employee with a disability to enjoy the benefits and privileges of employment, equal to those enjoyed by similarly situated non-disabled employees as required by law.

–4–

We will not be able to make an accommodation that would impose an undue hardship on the operation of the Center.

## Alcoholic Beverages

On limited occasions, the employees of the Buffalo Bill Center of the West who are of legal drinking age are permitted to consume alcoholic beverages while on the premises of the Center. These occasions require the responsible consumption of alcohol and occur when employees are guests of the Center at a social event. On all other occasions, employees are prohibited from drinking alcoholic beverages on Center property.

When the consumption of alcoholic beverages is allowed, employees are expected to drink responsibly and not to the point of inebriation.

When an employee is working, the employee is specifically forbidden to consume alcohol.

## Background Checks

The policy of the Buffalo Bill Center of the West is to require verification of employment and education, criminal background and licensure (when applicable) for all prospective staff members, volunteers, and interns prior to them attaining full-time, part-time, seasonal or volunteer status or obtaining access ID cards for the Center. It shall further be the policy of the Buffalo Bill Center of the West to require a driving record for any person who is expected or is allowed to drive a Center vehicle prior to authorization to drive a Center vehicle. Adverse information may result in the withdrawal of an offer of employment or denial of permission to drive Center owned vehicles.

## Code of Ethics

**Replacement of all other Ethics Policies**
This document replaces all other Center Ethics statements, policies and documents. All policy documents of the Center which refer to ethics in any manner will be conformed to this document.

**Definitions**
**Center** - The Buffalo Bill Memorial Association d/b/a The Buffalo Bill Center of the West
**Board** - The Board of Trustees of the Buffalo Bill Memorial Association. This body is the governing authority of the Center
**ACRM Committee** - The Audit, Compliance and Risk Management Committee of the Board - This Committee is responsible for ensuring that the Trustees, Advisors, Staff and Volunteers comply with the policies of the Center
**Advisors** - The group of individuals who are formally elected by the Board to act in an advisory (non-governing) capacity to the Center
**Executive Director** - The individual appointed Chief Executive Officer of the Center

responsible for the implementation of Board approved policy and plans
**Staff** - All paid employees of the Center reporting through the organization structure to the Executive Director and CEO
**Volunteers** - Unpaid members of the Center staff who work under the direction of Center employees and who are covered by the volunteer laws of the State of Wyoming
**Trustees** - Members of the Board

## Introduction

This Ethics Policy has been developed to provide standards to guide the policy development and operations of the Center. The Center and its Trustees, Advisors, Staff and Volunteers strive to adhere to the highest ethical standards required by the Code of Ethics of the American Alliance of Museums, Federal and State law and in the spirit of the American West and in our efforts to preserve the western spirit, the Code of the West.

The Code of Ethics of the American Alliance of Museums is attached to this document as a reference that places the Center's Ethics Policy in the context of the greater museum community in the United States. The Board has approved this Ethics Policy and through its actions will ensure that the Center meets and exceeds the standards we have set forth for ourselves.

Over the course of many decades of operation, the Center's ethical standards have changed and evolved to meet the changing times and situations which face non-profit organizations. In recent years, a new Credo that sets a direction for the Center and new Vision, Mission and Values statements have been created which inform the Ethics Policy of the Center. The Code of the West has gained new prominence as a set of simple standards for organizations to live by. Cowboy Ethics have become popular and have been included into the laws and policies of the State of Wyoming. Center policies informed by the documents enumerated above can be distilled into the following sentence;

### The Center and all those who are a part of its governance and operations must do what is right!

## The Credo, Code of the West and the Center's Values Statement

The Credo document approved by the Trustees sets a strong course for the Center as the lead organization responsible for keeping the "Spirit of the American West" alive for current and future generations. The "Spirit of the American West" embodies an ethos that requires fair dealing and actions from all who believe in it and has been distilled by the author Zane Gray in 1934 as the "Code of the West" and was his attempt to put into words the practices he saw during his life of writing about the American West:

### The Code of the West
If it's not yours, don't take it
If it's not true, don't say it
If it's not right, don't do it

These simple words provide the essence of what we attempt to codify in our Ethics Policy. We ask all of our Trustees, Advisors, Staff and Volunteers to live by these words and the spirit in which they have been set down.

The concepts embodied in the Credo and the Code of the West are expanded in the Values Statement approved by the Board of Trustees as part of our Strategic Plan. The Values Statement embodies the essence of what we strive to do in all of our activities.

**The Buffalo Bill Center of the West will secure and expand its reputation as the world's foremost authority on and interpreter of the American West.**

The Center codifies these statements as the guiding principles of our Ethics Policy.

<u>**Policy**</u>

Duty to the Center
Trustees, Advisors, Staff and Volunteers have a primary duty to the Center and its interests when involved with the business of the Center. This primary duty must take precedence over all other matters and overrides an individual's personal opinion, needs and desires. There can be no actual or perceived conflicts between what is right for the Center and personal needs. When potential conflicts arise, they must be openly and honestly declared.

Collections and Information
Trustees, Advisors, Staff and Volunteers shall ensure that the Center's collections are used and preserved for the benefit of the public. The Center has established a separate Collections Policy that governs the operations of the collections for public benefit. It is the duty of every Trustee, Advisor, Staff member and Volunteer to ensure that the Collections Policy is adhered to and that violations of that policy are reported to the Executive Director and the ACRM Committee. The Center capitalizes collections for accounting purposes. The Center's collections are not used or encumbered for any purpose as they are held for the benefit of the public. Trustees, Advisors, Staff and Volunteers also have a duty to present information and programmatic content in an accurate and appropriate manner. Always, when presenting information and programmatic content, the truth shall be of paramount importance. Disagreements on scholarship are the purview of the professional staff and ultimately rest with the Executive Director. The Executive Director shall develop a policy to ensure that allegations of plagiarism or the withholding of the truth are investigated and acted upon. When actions are taken, they shall be reported to the ACRM Committee.

Compliance with Law and Policy
The Executive Director is responsible for compliance with all applicable Federal, State and local laws. In addition, he/she is responsible for the Center's compliance with policy as established by the Board. The Executive Director or his/her designee reports regularly on compliance to the ACRM Committee.

Declaration of Conflicts of Interest
Each Trustee, Advisor, Staff member or Volunteer has a duty to declare any real or perceived conflict of interest arising out of their responsibilities and the needs of the Center.

For Trustees and Advisors, the beginning of each meeting of the Board and its Committees or Advisory Boards has a formal agenda item that asks for the declaration of conflicts of interest. At that time, any real or perceived conflict between Trustees' or Advisors' personal situation and the business of the Center must be declared. Such declarations will be recorded in the minutes of the meeting and the Chairman of the Board, Committee, or Advisory Board must take action to eliminate the real or perceived conflict. Action may include the individual voluntarily recusing him or herself from the discussion and decision making related to the conflict or action by the Chairman (if warranted) to have the individual remove themselves from the discussions and decision making.

For Staff and Volunteers, the individual having a real or perceived conflict with any activity related to the Center's operations shall declare such conflict to the Executive Director or the designated Division Leader on duty in the absence of the Executive Director. The conflict shall be recorded and the Executive Director or his/her designee shall decide in a timely manner if the conflict is relevant. The decision of the Executive Director or his/her designee shall be reported to the ACRM Committee at the next regularly scheduled meeting of the Committee.

## Compliance with Ethical Standards

It is the duty of the ACRM Committee to ensure that all activities of the Trustees, Advisors, Staff, and Volunteers are conducted in accordance with the spirit and letter of this policy. This Committee is empowered to investigate real or perceived conflicts as stated in this policy and shall recommend action to be taken to the Board. Actions related to the violation of this policy may include, but is not limited to, expulsion, termination, censure or other administrative action. Actions must be approved by the Board of Trustees in the case of a Trustee or Advisor. Actions must be approved by the Executive Director or his/her designee in the case of a Staff member or Volunteer.

## **Potential Trustee and Advisor Conflicts of Interest**

### Affiliation with Another Institution

Trustees and Advisors often serve on numerous boards and committees. It is the duty of the Trustee or Advisor to place the needs of the Center before those of any other organization when conducting Center business or activities. When the needs of another organization and those of the Center conflict, it is the duty of the Trustee or Advisor to declare the conflict at the beginning of any meeting of the Board or Committee upon which they serve.

### Business Dealings

Trustees and Advisors often have interests in businesses which the Center uses for its business purposes. The small size of the community and the very low population in the region often means that there are no or few opportunities for the Center to have an arms-length business relationship. In the case where a Trustee or Advisor has a business relationship with an organization doing business with the Center, the Trustee or Advisor may not approach the Center's Executive Director or other Staff members responsible for the Center's operations in an attempt to influence their decision making related to their organization doing business with the Center. If such contact occurs, the Trustee or Advisor involved shall report the occurrence to

the Executive Director who shall immediately report the occurrence to the ACRM Committee for resolution. The Center requires all business dealings with Trustees or Advisors to be disclosed to the ACRM Committee in writing.

Commercial/Private Buying and Selling of Objects or Collections in Areas for which the Center Collects
Trustees and Advisors often have interests in collecting in the fields in which the Center collects. Trustees and Advisors should ensure that the relevant curatorial staff is aware of their collecting interests. In no instance may a Trustee or Advisor purchase or attempt to purchase an object or artwork which the museum is attempting to purchase or otherwise obtain. It is the duty of each Trustee or Advisor to disclose their purchase of an object or artwork which may be of interest to the Center to the relevant Curator who shall report this fact to the Executive Director to determine if the Center would have an interest in the object or artwork. If the Center has an interest, it is the obligation of the Trustee or Advisor to offer the object or artwork to the Center at the price for which he/she paid for the object plus relevant shipping fees. All such instances shall be reported in writing to the ACRM Committee for review.

Gifts and Favors
Trustees and Advisors may present personal gifts and favors to Staff members; any gift with a monetary value over $100 requires the approval of the Executive Director. Gifts approved by the Executive Director shall be reported to the ACRM Committee once an individual receives a cumulative value of $500 or more in a year and recorded in a permanent log.

Purchase of Museum Property
No Trustee or Advisor shall purchase Center land/buildings or non-collection property without an arms-length sale that establishes through a third party the fair market value for the land/buildings or property in question. In addition, such sales shall be open to non-Trustees and Advisors and advertised to the public to ensure that the public has ample opportunity to review and bid for the property and/or buildings in question.
No Trustee or Advisor may purchase deaccessioned collections under any circumstances.

Use of Assets
No Trustee or Advisor may use Center assets for personal purposes except where such assets are normally available to the public and the Trustee or Advisor compensates the Center in the normal manner for the use of such assets.

Confidentiality
Trustees and Advisors have a duty to protect the Center's information in any form in which it is received. Trustees and Advisors may not disclose any proprietary information to anyone outside of the Board or Committee upon which they serve. Deliberations at Board and Committee meetings are confidential. Breaches of confidentiality shall be reported to the ACRM Committee for appropriate action.

Use of the Center's Name
No Trustee or Advisor may use the Center's name for personal gain.

Relationships with the Executive Director
The Executive Director is responsible to the Board of Trustees through its Chairman. He/she reports to the Board as a whole and not to Trustees as individuals. The Executive Director supervises all Staff and Volunteers and is responsible for the operations of the Center within the policies and guidelines set forth by the Board. Conflicts between the Executive Director and individual Trustees and Advisors will be reported to the Chairman of the Board of Trustees and to the ACRM Committee for disposition.

## Potential Staff and Volunteer Conflicts of Interest

Loyalty
While loyalty to the Center must be paramount, it is recognized that Staff and Volunteers have private lives. Staff and Volunteers are entitled to independence consistent with their responsibilities and equal to that granted to comparable professionals and volunteers in other disciplines.

While the Center is a private enterprise, its Staff and Volunteers are in the public eye to a great extent and enjoy a measure of public esteem. Staff and Volunteers are never wholly separable from the Center, and any public action by them may reflect upon the Center or be attributed to it. Therefore, Staff and Volunteers must not only be concerned with his/her motivations and interests as he or she sees them, but also with the way actions might be interpreted by others. Staff and Volunteers shall disclose to the Executive Director activities benefiting other organizations including affiliations with museums, voluntary community groups and public service organizations.

Confidentiality
Information about the operational activities of the Center acquired in the course of duties and not generally known or available to the public must be considered proprietary to the Center. Staff and Volunteers shall not use for personal advantage or for purposes detrimental to the Center such information received as a result of serving the Center.
Staff and Volunteers may not disclose proprietary information to anyone outside of the Center for any reason.

Personal Collecting
The Center encourages personal collecting in all fields as long as the Staff member or Volunteer neither competes with the Center for objects nor takes advantage of information proprietary to the Center. No Staff or Volunteer shall use their Center affiliation to promote his own, his family's, or his associates' personal collecting activities. Should conflict develop between the desires of the individual and the needs of the Center, the needs of the Center shall prevail.
Staff and Volunteers must disclose to the Executive Director all personal acquisitions that are related to the Center's collections or that are potentially sensitive relative to the Center's collections. The Executive Director shall make a

determination on the potential use of the object or artwork by the Center and shall approve the acquisition by the Staff or Volunteer or shall purchase the object from them at the price for which they paid for the object or artwork. Decisions involving acquisition by Staff or Volunteers shall be reported in writing to the ACRM Committee. The Center is assumed to have the right to acquire or refuse all objects (except promised gifts of bequest) acquired personally by Staff or Volunteers who judge or influence Center acquisitions.

## Publications

Manuscripts, lectures, photographs, graphic images, and all other material prepared by Staff or Volunteers for publication as part of their assigned duties or prepared at the Center's expense, are the property of the Center. Further, all such publishable work based wholly or substantially upon material from Center collections and archives, or obtained through privileged access to those collections, are the property of the Center. The use of materials in the collections of the Center for subsidiary documentation, or as supportive or comparative materials, shall not be deemed as contributing a substantial role. Unless arranged otherwise with the Executive Director (and in case of the Executive Director, with the Board), the Center shall retain the right to copyright and publish any publishable work produced as such by a member of the Staff.

The Center recognizes that it is the professional obligation of scholars in the museum world, as well as in the academic world, to make contributions in their fields of knowledge. The Center further recognizes that such contributions reflect credit upon the Center. The Center therefore encourages independent research, writing and publication by Staff and Volunteers, so long as those activities do not, in the judgment of the Executive Director (and in case of the Executive Director, the judgment or the Board) interfere with the conduct of their duties within the Center.

The Center further makes no claim on the copyright, or on royalties or other remuneration received by Staff or Volunteers for independent research, writing, and publication so long as the following conditions are met:

1. The name and reputation of the Center be enhanced by such activities.
2. Manuscripts, lectures and visual materials be written or prepared by Staff members or Volunteers during their personal time (defined as those hours before and beyond normal working hours).
3. Such activities do not impinge upon the Staff member's or Volunteer's duties and obligations to the Center.
4. Direct costs (e.g. for photography, secretarial help, travel, etc.) be borne by the Staff member or Volunteer unless some other equitable arrangement be made in advance.
5. Should a Staff member or Volunteer choose to produce, on personal time and at personal expense, products or graphic images which utilize Center photos, etc., current and appropriate standing reproduction fee must be paid the Center by the Staff member or Volunteer.

A Staff member or Volunteer must notify the Executive Director (or in case of the

Executive Director, the Board of Trustees) prior to undertaking any major independent project (e.g. lecture series, research or text for films, catalogues, product design, books, exhibitions, etc.).

Sensitive Issues
Staff and Volunteers shall not in any manner involve the Center in any issue beyond the purposes of the Center as set forth in its Articles of Incorporation and the By-laws, and as articulated by the Board.
Staff and Volunteers shall not presume to speak for the Center on subjects and matters outside the scope of their employment or duties.
Even when Staff or Volunteers explicitly comply with this policy, the Center's attribution and involvement can nonetheless occur due to media interpretation or communication error. In such an event, the Executive Director may publicly declare the official stand of the Center, even if this is non-supportive of the Staff or Volunteer's personal opinions expressed or their public and/or private statements.

Use of the Center's Name in Connection with Outside Activities
Staff and Volunteers of the Center should be discreet in using the Center's name and in alluding to their relationship with the Center. Staff and Volunteers are urged to review with their supervisor any such use that is potentially detrimental to the Center.

Use of Center Property
Staff and Volunteers shall not use the Center's collections, property, services, supplies or resources - except for official business of the Center. The Executive Director or his designee shall have the authority to grant warranted exceptions. The Center's collections may not be used in any manner inconsistent with the Center's Collections Policy.
Staff and Volunteers are expected to exercise care in the use of Center property. Negligence in the care and use of Center property, unauthorized removal or personal use of Center property may be cause for discipline. Center property issued to Staff and Volunteers, including software, manuals and proprietary information, must be returned if their employment or volunteer experience with the Center is terminated, either voluntarily or involuntarily. If Center physical property is not returned, Staff and Volunteers will be responsible for the value of the property. Proprietary information must be returned to the Center and not disclosed outside of the Center.
No Staff or Volunteer will remove Center property from the premises without written permission from the supervisor or department head who is responsible for the property in question. Examples of the kind of property subject to this policy are:
1. Collections
2. Materials, equipment and tools
3. Property owned by the Center or other employees
4. Computer disks, tape and other storage media

Removing or attempting to remove Center's physical or intellectual property without proper permission can result in discipline, up to and including termination or other legal action.

## Loans to the Center

Loans to the Center of art objects borrowed, owned, or created by Staff or Volunteers can benefit the Center and the public. However, objects can be considerably enhanced in value by being exhibited. Therefore, the sole consideration of the Center in asking for and accepting such loans shall be the prospective benefit to the public.

## Communication with Trustees and Advisors

In all administrative matters, Staff and Volunteers should deal openly and candidly with the Executive Director, who is the Chief Executive Officer, or with his appointed designee. Staff and Volunteers shall communicate with Trustees on administrative matters through the Executive Director or with his/her knowledge. Trustees shall avoid giving directions to, acting on behalf of, or soliciting administrative information from Staff or Volunteers unless they do so according to established procedures or unless they have the approval of the Executive Director. Staff and Volunteers may communicate directly at any time with the designated Trustee under the Whistleblower provisions found in the Employee and Volunteer Handbooks.

## Dealing by Staff and Volunteers

Staff and Volunteers may not deal in objects similar or related to the objects collected by the Center. Dealing shall be defined as buying and selling for profit on a regular basis, or maintaining an interest in any dealership, as distinguished from occasional selling or exchanging in the management of a personal collection.

## Appraisals and Authentication

Under no circumstances may Staff or Volunteers of the Center appraise objects either as part of their normal daily duty or as an independent service. If Staff or a Volunteer is requested to offer an appraisal he or she must refer the task to two or more outside professionals within the field.

Within their own fields of expertise, Staff and Volunteers may feel it appropriate to offer authentication of objects brought to their attention. However, authentication may be offered only in accordance with procedures established by the Center and approved by the Board.

Staff or a Volunteer may identify (as opposed to authenticate or appraise) objects relative to his or her areas of expertise, if in their judgment, the object can be identified by comparison with similar objects or published authority.

## Acceptance of Gifts

Staff and Volunteers must declare gifts of more than $100 value from Trustees, Advisors, artists, authors, dealers or suppliers to the Executive Director who will approve all such gifts and report the cumulative total to ACRM should the amount exceed $500. The term "gifts" encompasses not only works of art but also discounts on personal purchases greater than those offered to the Center, offers of outside employment, and other arrangements. The Staff or Volunteer may accept and keep gifts that derive from purely personal and family relationships. To protect himself/herself and the Center, Staff and Volunteers must disclose gifts of greater than $100 or a cumulative value of $500 or more per year to the Executive Director.

## Outside Employment

Certain types of outside activities, including self-employment and consulting, can benefit both the Center and the Staff or Volunteer by stimulating professional development. Staff and Volunteers are encouraged to teach, lecture and write provided those activities do not interfere with the performance of Center duties. If they are performed during normal working hours or with the use of Center resources, the Staff or Volunteer and the Executive Director (or in the case of the Executive Director, the Board) must agree in writing in advance on an equitable arrangement concerning time, remuneration and copyrights. Remuneration may be monetary or nonmonetary, direct or indirect.

All outside employment of Staff or Volunteers including volunteer activities must be based on the premise that Staff and Volunteers have a primary responsibility to the Center and that the activity will not interfere with their discharging of this responsibility and that it will not compromise the professional integrity of the Staff or Volunteer or the reputation of the Center. Staff and Volunteers engaged in outside activities similar to those they perform for the Center are often perceived as representatives of the Center even though the outside work may be wholly independent of the Center. For that reason, Staff and Volunteers must disclose to the Executive Director (or in the case of the Executive Director, to the Board) any planned outside employment that in any way resembles or relates to the duties they perform for the Center. Staff or a Volunteer need not disclose a small business or activity entirely unrelated to the work he/she performs for the Center.

All outside work should be carried out on a Staff or Volunteer's personal time apart from his or her Center working hours. The receipt of additional compensation from any source for work carried out during time for which the Staff member is already being paid by the Center is not permitted.

## Contracts with Employees

Staff or a Volunteer who is additionally engaged by the Center as a contractor for special services or products outside the scope of his or her regular Center duties should be certain that the contractual obligations will be incurred and all the work performed on the Staff or Volunteer's personal non-duty time. Under such special contractual agreements no Center property, materials or equipment may be used without being expressly allowed within the terms of the contract.

## Staff Assistance

Should Staff or Volunteers turn to other Staff or Volunteers for personal assistance, they must expect no more than what properly would be given to any other citizen in similar circumstances with similar requirements.

## Staff Referrals of Outside Services

Staff and Volunteers should be circumspect in referring private citizens to outside suppliers of services such as appraisers, restorers, conservators, etc. To avoid the appearance of favoritism, more than one qualified source of service should be provided whenever possible.

## Purchase of Center Property

Staff and Volunteers may purchase surplus Center property of nominal value provided the property is offered to all Staff and Volunteers equally. Property of

higher value will be sold publicly and Staff and Volunteers are permitted to follow the same processes for the purchase of property as the general public.
Staff and Volunteers are not permitted to purchase deaccessioned collection items at any time.

Political Activity
The Center encourages Staff and Volunteer participation in the political processes of our nation, state and locality. Such participation should not interfere with Staff and Volunteer work activities without prior notification to the Executive Director. No political activity may occur on Center property and Center resources (e.g. computers) may not be used for political purposes.

## Computer Use and Internet Policy

This policy is intended to provide all users of the Center's computer and network resources with guidelines about which uses of the Internet are proper, and which uses are improper.

This policy applies to all Center employees and all other authorized users of the electronic mail and messaging infrastructure made available by the Center, including Internet, intranet and on-line access provider systems, whether or not during working hours. Users are responsible for complying fully with this policy as stated, but the Center reserves the right to modify this policy at any time, with or without prior notification. Violations could be the basis for employee discipline or discharge.

1. **No Privacy**. The Center provides computers, network resources and Internet connections ("facilities") to further its business and intellectual interests. You should use those facilities only for Center business. The facilities are owned solely by the Center and information in the facilities will be treated just like other company business records, files, electronic records, documents, materials and equipment. The Center has the right, but not the duty, to monitor all communications and downloads passing through its system, at its sole discretion. If incidental or occasional personal use of the system is made, such use is still subject to the same policies and procedures set out in this policy.

The Center reserves the right to review all electronic records, including e-mail messages. Therefore, employees should have no personal expectation that their electronic mail messages are private. It is understood that even after a user "deletes" files, e-mail or any other form of data on these facilities, the data is not permanently deleted and may be recovered.  Any information on the Center's facilities may be disclosed to outside parties or to law enforcement authorities.

It is understood that use of the Internet involves using public devices outside the control of the Center and there is absolutely no guarantee of privacy for data passing over the Internet.

**2. Improper Activities.** You may not disseminate or knowingly receive harassing, pornographic, threatening or illegal information by use of the Center's facilities. You may not use the Center's facilities to conduct any illegal activity. You may not use the Center's facilities for personal or commercial advertisements, solicitations or promotions. You may not use the Center's facilities to distribute proprietary information.

**3. Nature of E-Mail.** E-mail resembles speech in its speed and lack of formality. Unlike speech, e-mail leaves a record that is often retrievable even after the sender and recipient delete it. If you would not want your mother to read your message on the front page of the Los Angeles Times, do not send it by e-mail. E-mail is not secure and not retractable. Please be aware of the following when using e-mail:

- E-mail messages can be misdirected by the sender or by an error in the message routing process.
- Internet e-mail relies on public networks that are outside the Center's control. Service levels and confidentiality cannot be guaranteed.
- Once sent, e-mail messages cannot be retrieved or removed from a recipient's mailbox.

**4. Intellectual Property of Others.** You may not download or use material from the Internet or elsewhere in violation of software licenses, or the copyright trademark and patent laws. You may not install or use any software obtained over the Internet without permission from the Information Technology Department.

## Drug Free Workplace

The Center prohibits the unlawful manufacture, distribution, possession or use, including being on duty under the influence, of controlled substances in the work place. The use of illegal drugs may result in impaired performance or judgment and raises questions about the employee's trustworthiness. Employees who engage in prohibited activities are subject to disciplinary action, up to and including discharge.

An employee convicted of a drug-related criminal offense occurring on Center grounds or while on duty is responsible for reporting the conviction to his or her supervisor within 5 days. The Center will consider all available information including, but not limited to, the nature of the charges and their relation to the employee's position, in deciding what, if any, employment-related action might be appropriate.

## Equal Employment Opportunity Policy

The Center provides equal employment opportunities (EEO) to all employees and applicants for employment without regard to race, color, religion, sex, national origin, age, disability or status as a Vietnam-era or special disabled veteran in accordance with applicable federal, state and local laws. The Center complies with applicable state and local laws governing non-discrimination in employment in every location in which the Center has facilities. This policy applies to all terms and conditions of employment, including, but not limited to, hiring, placement,

promotion, termination, layoff, recall, transfer, leaves of absence, compensation and training.

The Center expressly prohibits any form of unlawful employee harassment based on race, color, religion, sex, national origin, age, disability, or veteran status. Improper interference with the ability of Center employees to perform their expected job duties is absolutely not tolerated.

**Complaint Procedure**

Each member of management is responsible for creating an atmosphere free of discrimination. Further, employees are responsible for respecting the rights of their coworkers.

If any employee believes that he or she has been subject to any job-related discrimination or harassment based on race, color, religion, gender, national origin, age, disability or status as a Vietnam-era or special disabled veteran, the employee must report it in writing to the Human Resources Manager and his or her immediate supervisor. If either one of these individuals is the one you believe is harassing you, only report it to one.

These persons are available to discuss any concerns an employee may have to provide information about the company's policy on equal employment and its complaint procedures.

**Investigation Procedure**

When the Center receives notice of conduct that appears to be unlawful discrimination or harassment, it will promptly investigate the allegation in a fair and expeditious manner. The investigation will be conducted in such a way as to maintain confidentiality to the extent practicable under the circumstances and permissible by law.

**Appropriate Response/Disciplinary Action**

If it is determined that an employee has been engaged in inappropriate conduct, appropriate action will be taken immediately to fulfill the Center's obligation under the law to promote a workplace free of unlawful discrimination or harassment. Such action may range from discussion and counseling to termination of employment, and may include other forms of disciplinary action appropriate to the circumstances.

**No Retaliation**

All employees should take special note that retaliation against an individual who has filed a bona fide complaint about unlawful discrimination or harassment or who has cooperated with an investigation for the same type of complaint is unlawful and will not be tolerated by the Center.

| Family Medical Leave Policy |
| --- |

A. General Provisions

It is the policy of the Center to grant up to 12 weeks of family and medical leave

during any 12-month period to eligible employees, in accordance with the Family and Medical Leave Act of 1993 (FMLA). The leave may be paid, unpaid or a combination of paid and unpaid leave, depending on the circumstances of the leave and as specified in this policy.

B. Eligibility

To qualify to take family or medical leave under this policy, the employee must meet all of the following conditions:

1) The employee must have worked for the Center for 12 months or 52 weeks. The 12 months or 52 weeks need not have been consecutive. For eligibility purposes, an employee will be considered to have been employed for an entire week even if the employee was on the payroll for only part of a week or if the employee is on leave during the week.

2) The employee must have worked at least 1250 hours during the 12-month period immediately before the date when the leave is requested to commence. The principles established under the Fair Labor Standards Act (FLSA) determine the number of hours worked by an employee. The FLSA does not include time spent on paid or unpaid leave as hours worked. Consequently, these hours of leave should not be counted in determining the 1250 hours eligibility test for an employee under FMLA.

3) The employee must work in an office or worksite where 50 or more employees are employed by the Center within 75 miles of that office or worksite.

C. Type of Leave Covered

To qualify as FMLA leave under this policy, the employee must be taking leave for one of the reasons listed below:

1) The birth of a child and in order to care for that child;

2) The placement of a child for adoption or foster care and to care for the newly placed child;

3) To care for a spouse, child or parent with a serious health condition; or

4) The serious health condition (as follows) of the employee.

An employee may take leave because of a serious health condition that makes the employee unable to perform the functions of the employee's position. A serious health condition is defined as a condition which requires inpatient care at a hospital, hospice or residential medical care facility, including any period of incapacity or any subsequent treatment in connection with such inpatient care or a condition which requires continuing care by a licensed health care provider.

This policy covers illnesses of a serious and long-term nature, resulting in recurring or lengthy absences. Generally, a chronic or long-term health condition which, if left untreated, would result in a period of incapacity of more than three days, would be considered a serious health condition.

Employees with questions about what illnesses are covered under this FMLA policy or under the company's sick leave policy are encouraged to consult with the Human Resources Department.

The Center will require an employee to provide a doctor's certification of the serious health condition.  The certification process is outlined in section H.

If an employee takes paid sick leave for a condition that progresses into a serious health condition and the employee requests unpaid leave as provided under this policy, the company may designate all or some portion of related leave taken as leave under this policy, to the extent that the earlier leave meets the necessary qualifications.

An eligible employee can take up to 12 weeks of leave under this policy during any 12-month period.  The Center will measure the 12-month period as a rolling 12-month period measured forward from the date an employee uses any leave under this policy.   Each time an employee takes leave, the company will compute the amount of leave the employee has taken under this policy and subtract it from the 12 weeks of available leave, and the balance remaining is the amount the employee is entitled to take at that time.

If married spouses both work for the Center and each wishes to take leave for the birth of a child or adoption or placement of a child in foster care, the spouses may only take a combined total of 12 weeks of leave.

D. Employee Status and Benefits During Leave

While an employee is on leave, the Center will continue the employee's health benefits during the leave period at the same level and under the same conditions as if the employee had continued to work.

If the employee chooses not to return to work for reasons other than a continued serious health condition of the employee or the employee's family member or a circumstance beyond the employee's control, the company will require the employee to reimburse the Center the amount it paid for the employee's health insurance premium during the leave period.

Under current Center policy, the employee pays a portion of the health care premium.   While on paid leave, the employer will continue to make payroll deductions to collect the employee's share of the premium. While on unpaid leave, the employee must continue to make this payment, either in person or by mail. The payment must be received in the Accounting Department by the 15th day of each month.  If the payment is more than 30 days late, the employee's health care coverage may be dropped for the duration of the leave.  The employer will provide 15 days' notification prior to the employee's loss of coverage.

If the employee contributes to a life insurance plan or other supplemental insurance, the Center will continue making payroll deductions while the employee is

on paid leave.  While the employee is on unpaid leave, the employee may request continuation of such benefits, and pay their portion of the premiums; or the employer may elect to maintain such benefits, and pay their portion of the premiums; or the employer may elect to maintain such benefits during the leave and pay the employee's share of the premium payments.  If the employee does not continue these payments, the employer may recover the costs incurred for paying the employee's share of any premiums whether or not the employee returns to work.

## E. Employee Status after Leave

An employee who takes leave under this policy will be able to return to the same position or a position with equivalent status, pay, benefits and other employment terms.  The position will be the same or one which is virtually identical in terms of pay, benefits and working conditions.

The Center may choose to exempt certain highly compensated employees from this requirement and not return them to the same or similar position.

## F. Use of Paid and Unpaid Leave

If the employee has accrued or earned paid leave the employee must use paid leave first and take the remainder of the 12 weeks as unpaid leave.

An employee who is taking leave because of the employee's own serious health condition must use all sick leave, major medical leave, vacation and then personal leave prior to being eligible for unpaid leave.  An employee who is taking leave due to the serious health condition of an immediate family member must use all sick leave, vacation and then personal leave prior to being eligible for unpaid leave. An employee who is taking leave due to the adoption or placement of a foster child must use all vacation and then personal leave prior to being eligible for unpaid leave.

## G. Intermittent Leave or a Reduced Work Schedule

The employee may take FMLA leave in 12 consecutive weeks, may use the leave intermittently (take a day periodically when needed over the year) or under certain circumstances may use the leave to reduce the workweek or workday, resulting in a reduced hour schedule.  In all cases, the leave may not exceed a total of 12 workweeks over a 12-month period. The Center may temporarily transfer an employee to an available alternative position with equivalent pay and benefits if the alternative position would better accommodate the intermittent or reduced schedule.

For the birth, adoption or foster care of a child, the Center and the employee must mutually agree to the schedule before the employee may take the leave intermittently or work a reduced hour schedule.  Leave for birth, adoption or foster care of a child must be taken within one year of the birth or placement of the child.

If the employee is taking leave for a serious health condition or because of the serious health condition of a family member, the employee should try to reach agreement with the Center before taking intermittent leave or working a reduced hour schedule. If this is not possible, then the employee must prove that the use of the leave is medically necessary. The Center will require certification of the medical necessity as discussed in Section H.

H. Certification of the Serious Health Condition

The Center will ask for certification of the serious health condition.  The employee should try to respond to such a request within 15 days of the request or provide a reasonable explanation for the delay. Failure to provide certification may result in a denial of continuation of leave. Medical certification will be provided using the Medical Certification Form.

Certification of the serious health condition shall include: the date when the condition began, its expected duration and a brief statement of treatment.  For medical leave for the employee's own medical condition, the certification must also include a statement that the employee is unable to perform work of any kind or a statement that the employee is unable to perform the essential functions of the employee's position.  For a family member who is seriously ill, the certification must include a statement that the patient, the family member, requires assistance and that the employee's presence would be beneficial or desirable. If the employee plans to take intermittent leave or work a reduced schedule, the certification must also include dates and the duration of treatment as well as a statement of medical necessity for taking intermittent leave or working a reduced schedule.

The Center has the right to ask for a second opinion if it has reason to doubt the certification. The Center will pay for the employee to get a certification from a second doctor, which the Center will select. If necessary to resolve a conflict between the original certification and the second opinion, the Center will require the opinion of a third doctor. The Center and the employee will mutually select the third doctor and the Center will pay for the opinion. This third opinion will be considered final.  The employee will be provisionally entitled to leave and benefits under the FMLA pending the second and/or third opinion.

I. Procedures for Requesting Leave

All employees requesting leave under this policy must provide verbal notice with an explanation of the reason(s) for the needed leave to their immediate supervisor, who will advise the Human Resources Department. To apply for this leave, employees must complete the employee portion of the Certification of Health Care Provider form. This form may be obtained from the Human Resources Department.

The Center will provide individual notice of rights and obligations to each employee requesting leave within two business days or as soon as practicable.

If an employee fails to provide 30 days' notice for foreseeable leave with no reasonable excuse for the delay, the leave request may be denied until at least 30

–21–

days from the date the employer received notice. While on leave, employees are requested to report periodically to the company regarding the status of the medical condition and their intent to return to work.

This language was adopted on 2/7/08

J.  Leave granted through the National Defense Authorization Act of 2008

Family Leave Due to a Call to Active Duty - This benefit provides 12 weeks of FMLA leave due to a spouse, son, daughter or parent being on active duty or having been notified of an impending call or order to active duty in the Armed Forces. Leave may be used for any "qualifying exigency" arising out of the service member's current tour of active duty or because the service member is notified of an impending call to duty in support of a contingency operation.

Caregiver Leave for an Injured Service member - This benefit provides 26 weeks of FMLA leave during a single 12-month period for a spouse, son, daughter, parent, or nearest blood relative caring for a recovering service member. A recovering service member is defined as a member of the Armed Forces who suffered an injury or illness while on active duty that may render the person unable to perform the duties of the member's office, grade, rank or rating.

## High-Profile Visitors

When a celebrity, politician or other high-profile visitor visits the Center, employees are asked to give the individual no special attention, to protect the individual's privacy. We expect these visitors to follow the rules of the Center, just as any visitor.

The only staff member who should approach a high-profile guest (who is not here to visit with a staff member) is the Executive Director or his/her delegate. The Executive Director will greet and offer assistance (including a security staff member) or other accommodation.

Staff members are asked to treat the high-profile visitor in the same way as any other guest, i.e. with no intrusion on their private visit, no selfies, no offers of behind-the-scenes tours or any other unwelcome behaviors.

## Military Leave

Employees who are inducted into the U.S. Armed Forces or who are reserve members of the U.S. Armed Forces or state militia groups will be granted leaves of absence for military service, training or other obligations in compliance with state and federal laws. These employees may use accrued vacation leave but are not required to do so. (If the employee does not choose to use paid leave, the absence is unpaid). At the conclusion of the leave, employees generally have the right to return to the same position held prior to the leave or to positions with equivalent seniority, pay and benefits. Employees are requested to notify their supervisors as soon as they are aware of the military obligation. The Center may request a copy of

~22~

the orders of the employee required to be absent from work.

The Center supports full-time employee reservists called to active duty by providing a stipend to assist with family health insurance costs, either through the military or through the Center's group health plan.  The amount of the stipend is at the discretion of the Center.

### Mission Statement

To inspire, educate, and engage global audiences through an authentic experience with the American West.

### Non-Smoking Policy

The Center is a smoke free workplace.  No smoking is permitted in any inside space.

### Pay Categories

This list defines the possible pay categories for employees.  Employees will be told the pay category when they are offered employment or offered a different position.

a. <u>Full-Time/Salaried Employees</u>:  Employees who average 40 or more hours of work per week for a period of six (6) months and longer shall be considered full-time either upon hire or upon meeting the hours requirement. Such employees receive full museum benefits, and are paid bi-weekly, five days in arrears. All full-time positions are designated as either exempt or non-exempt from overtime.

b. <u>Part-Time/Hourly Employees</u>: Employees who work for six (6) contiguous months and average less than 40 hours a week are considered part-time employees either upon hire or upon meeting the requirement. As of July 1, 2017, part-time employees with average hours of work of 30 or more but less than 40 per week, shall continue to be considered part-time. These employees shall be offered the opportunity to enroll in the Center's group Health Insurance Plan as required by the Affordable Care Act after six (6) contiguous months of employment during which they average 30 hours or more per week.  Otherwise, these employees are entitled to the same benefits as other part-time employees.

c. <u>Defined Term Employees</u>:  Individuals employed to perform services for a discreet period of time for a specific, one-time project and are considered employees of the museum only for the duration of the term. They are entitled to all performance considerations and benefits granted regular employees of the same or related position classification (i.e. full or part-time) and length of employment. These positions end at the end of the defined term.

-23-

d. <u>Seasonal Employees</u>: As of January 1, 2015, seasonal employees shall be individuals employed for less than six months in a calendar year. Such employees are designated as non-exempt from overtime and are paid bi-weekly, five days in arrears.

## Pay Policies

### Pay for All Hours Worked

IT IS THE POLICY OF THE CENTER TO PAY EMPLOYEES CORRECTLY FOR ALL HOURS WORKED. Any employee who suspects that he/she has not been paid correctly for his/her hours of work should report his/her concern to his/her supervisor or the Human Resources Department. All complaints will be investigated and any errors will be corrected.

Employees are responsible for correctly recording their hours of work. If an employee recognizes that he/she made an error, the employee is responsible for informing his/her supervisor immediately.

Supervisors are responsible for verifying hours of work.

The same standards of honest communication apply to all employees in the Center.

### Overtime

Under the Fair Labor Standards Act, all job classifications and descriptions are designated as exempt or non-exempt from the overtime provisions of the law. Seasonal employees are eligible for overtime (non-exempt). Other employees shall receive their designation as exempt or non-exempt when the employee begins work in a position.

### Pay Periods

The workweek begins on Sunday and ends on Saturday. Employees are paid every two weeks. Paychecks are issued on Friday for the prior two weeks period of Sunday through Saturday.

### Personnel Record

All personnel records are on file in the Accounting/Payroll office. The records include all personnel information and evaluations. Such files are confidential and available only to the individual employee or to the administration, unless the Center is required to disclose them by force of law.

### Attendance

Regular attendance, reporting on time and working through all scheduled work hours is expected of each employee. Unsatisfactory attendance, including tardiness or leaving early without permission may be cause for disciplinary action, to include discharge. If for any reason an employee cannot report for work or report for work on time, it is mandatory that the employee promptly contact his/her supervisor who will determine if the absence is excused.

**Absenteeism**

Employees are expected to report for work on time and on a regular basis. If an employee will be absent or late for any reason, the employee must notify his/her supervisor as far in advance of the regular starting time as possible.

Notification from another employee or relative is not acceptable, except under emergency conditions. An excused absence may include personal or family illness, jury duty, bereavement, or other reasons that would require an employee to miss all or part of a scheduled workday. Employees should be prepared to substantiate the reason for absences if asked. Employees with frequent absences may be required to furnish documentation to substantiate the reason for the absences, including doctors notes.

If an employee fails to give proper notification of an absence or if his/her supervisor considers the reason unacceptable, the absence will be unexcused.

Unsatisfactory attendance will result in disciplinary action, including suspension and discharge.

**Lunch Period**

Most departments are able to schedule a daily unpaid lunch break of one-half or one hour for employees. However, some departments may give a short paid break in lieu of a lunch period, due to scheduling requirements. The Center retains the right to schedule or re-schedule employee lunch periods to meet the operational needs of the museum.

**Coffee Breaks or Rest Periods**

Generally, employees who work 8 or more regularly scheduled hours per day are permitted two paid rest periods of 15 minutes each; one rest period during the first half of the scheduled hours and one in the second half of the scheduled hours. Other employees working less than 8 regularly scheduled hours per day but more than two hours are permitted one paid rest period of 15 minutes. The supervisor retains the right to schedule or re-schedule employee rest periods to meet the operational needs of the Center.

**Time Recording**

All employees record their hours of work using a time clock or the TimeClock Manager software.

Pay Types

**Overtime Pay**

Overtime is paid to non-exempt employees only. The regular established workweek for employees is 40 hours. In cases where non-exempt employees (see classification description) are required to work more than 40 hours during a normal workweek, they become eligible for overtime. Overtime hours can be worked only at the request of the employee's immediate supervisor.

## Compensatory Time

Compensatory time is earned by exempt employees only. Generally, exempt employees are expected to work the time required to complete their job duties and to manage their calendars so that they do not need to work excessive hours. However, sometimes exempt employees are required to work a large number of hours outside their normal working hours due to special events or unavoidable circumstances. When this occurs, employees may receive compensatory time. This is not given on an hour for hour basis, but instead is given in an amount at the supervisor's discretion to allow the employee to rest and relax.

For Department Managers: After 50 hours of work in a week, the manager may take compensatory time with the approval of the executive director.

For Non-Department Managers: After 45 hours of work in a week, the supervisor may grant compensatory time.

The time must be taken before the end of the calendar year, except compensatory time for December must be taken by the end of the next month, January.

## Performance Evaluation

The goal of performance evaluation is to produce the best on-the-job performance possible by each employee. Consequently, performance evaluation is a continuous process and not simply a periodic formality.

Supervisors will keep in mind that communication regarding performance must occur regularly and routinely and should contain strong elements of positive reinforcement and focus on goal-setting and goal achievement rather than simply on criticisms and ratings.

Impromptu evaluation, in any form, will be submitted by supervisors for inclusion in the employee's confidential file. When written evaluation is used, the subject employee will be allowed to see the evaluation and attach a related statement if he or she so desires.

While Performance Evaluations are conducted from time to time,

# THE CENTER CONTINUES TO RESERVE THE RIGHT TO TERMINATE AN EMPLOYEE AT ANY TIME FOR ANY REASON, OR NO REASON. ALL EMPLOYEES REMAIN "AT WILL" EMPLOYEES.

## Personal Appearance Policy

Dress, grooming, and personal cleanliness of staff is important to the public image

of the Buffalo Bill Center of the West.  Every employee is encouraged to present a pleasing, professional image to represent the Center well.

The following personal appearance guidelines should be followed:

- Clothing should be kept clean, neat, and in good repair.
- Shoes must provide safe, secure footing, and offer protection against hazards. Some departments require closed toed shoes or boots for safety. The Security Department requires black shoes or boots as a part of the department uniform.
- Hair, mustaches and beards must be clean, well-trimmed, and neat. Employees should wear a hairstyle that is appropriate and professional.
- Clothing should be worn and fit in such a manner that it does not expose the abdomen, chest, upper thighs or buttocks areas.
- Clothing should be free of sexually related references or images, foul language, or language to promote the use of illegal drugs.
- Underwear should be covered by outerwear so the underwear is not visible.
- Tattoos with art or language that might be offensive to others must be covered with apparel.

## Personnel Management

# DISCHARGE. THE CENTER CONTINUES TO RESERVE THE RIGHT TO TERMINATE ANY EMPLOYEE AT ANY TIME, FOR ANY REASON OR FOR NO REASON. THE CENTER ALONE DECIDES WHETHER AN EMPLOYEE SHOULD BE DISCHARGED.

## Promotion and transfer

The goal regarding promotion and transfer is to have the Center served by the optimum employee in each position. Therefore, the Center is free to consider internal and external candidates for all position vacancies and notice about job openings is equally available to all.  Specific position classifications will be identified for which a Center employee would be given preference if, in the Center's opinion, the employee is immediately qualified to perform the position duties.

## Pest Management Policy

Pests endanger collections within a museum and the damage that can be done is

-27-

often irreversible. As an employee of the Buffalo Bill Center of the West, it is your responsibility to support and uphold all policies within the Center to ensure a safe and stable environment for the collections, its visitors and other employees. This information provides its reader with the common and the hazardous pests to look out for and what you can do to prevent infestations. You, in effect can help to sustain and protect the collections, it is beneficial to be aware of what you can do and what to look out for.

No work environment wants to see pests in their building, but this is even more important within a museum. The Center has a vast collection of organic materials such as feathers, furs and textiles and these artifacts are highly susceptible to pests as they offer a food and harborage source for some species. Other materials such as paper, paintings, basketry and wood are all at risk from pest attack and some insects can cause tremendous damage by grazing on the surface, staining the artifacts with droppings and others can devour whole natural history specimens.

What you can do.......

- Eat responsibly! Break rooms are the preferred food consumption areas. It is understood that on occasion employees may eat at their desk. In those cases, it is very important to remove any spilled wastes immediately. Throw all food related trash in the trash cans provided in the break rooms. NO FOOD RELATED TRASH SHOULD BE PLACED IN TRASH CANS IN YOUR OFFICE. No food should ever be stored in offices. If you spot pests in your office consider what may be attracting them. Beverages should be consumed from receptacles with lids at your desk and rinsed out after use. Food should be stored in designated food areas, NOT in offices! See the Food and Drink Policy that follows for the specific rules.
- Clean up after yourself! Ensure staff eating areas are clean and waste free, with food sealed in containers and put away. Clean up spills, wipe away crumbs and wash all dishes used. Your office space should also be clean and clutter free.
- Help us with monitoring! If you spot a pest or a problem in a collection, exhibit or building, report it or take a specimen to Chuck Preston in the Curatorial Department in a sealed container. If there are insects spotted, distinguish whether it is a 'pest or a guest' and use your judgment in deciding if it demands attention. A spider simply crawling across the floor does not demand attention, where as a very large number of spiders in one area signals a problem.

What to look out for.......

- Spiders and centipedes are among the 'good.' They eat other insects and do not pose an immediate threat to collections but may indicate the presence of other insects. Pill bugs, flies and crickets will wander in on occasion but they also do not pose an immediate threat. The pest monitoring program in place at the Center will decide how many is too many and deal with the situations.

- Ants are a nuisance as they are 'social' meaning it is very rarely just the odd one. A large number of them is unacceptable for sanitation purposes and will generally be dealt with.
- The 'bad' insects are another story; they endanger collections and these are the ones to identify to Museum Services Division members if you happen to come across one.

**Food and Drink Policy**

**Carrying Food and Drink through Public Areas of the Museum**
Food and drink may be brought on premises in spill proof containers and carried through public areas to acceptable storage or consumption areas provided the food and drink is concealed in a bag. Alternately, food and drink may be purchased from the Eatery, Coffee Bar or vending machines and carried through public areas to be consumed elsewhere provided it is enclosed in spill proof containers and concealed in a bag.

**Food Storage**
Food may be stored in a break room or a refrigerator designated for employee food. Break rooms are the following: CFM break room, PIM break room, and Education suite break room. Each of those locations has a refrigerator for food storage. The Administrative Office has a refrigerator for food storage as well.

The preferred container for food is a Tupperware type box with a sealing lid. This may be placed in the refrigerator, on the break room counter or on the counters. It is also acceptable to bring and store food in insulated bags, lunch boxes or other spill proof containers.

**Food Consumption**
The preferred food consumption area is one of the break rooms. Food may occasionally be consumed in an office, provided the following rules are followed: a) food is not stored in an office; b) spills are cleaned up immediately; and c) all food related trash is thrown away in the break room, never in an office trash can. Food and drink is not consumed in gallery space except for during a limited number of special events – such as the Patrons Ball.

The preferred locations for food consumption during approved special events are: John Bunker Sands Gallery, the Hub, the tiled map on the lower floor of the Draper, the open space at the entrance to the CFM and in the Coe Auditorium.

Food consumption is also permitted in the following meeting room space: the board room, the education classrooms, and the administration meeting room. Eating food is acceptable in the Eatery and Coffee Bar and in any outside area.

**Drinks**
Drinks in containers with lids may be consumed in office work areas and in break areas. Individuals who work directly with collections will have more restrictions on where they may place drinks in their work area, to minimize the risk of damaging objects.

Public Areas where drink consumption is permitted: The Eatery, Coffee Bar, the Hub and any outside benches or picnic tables on the property.  Guests may leave their beverages in spill proof containers (with their name recorded on the container) in the refrigerator in the Security desk area.

Special note for employees working in the Hub: The discrete consumption of drinks only is permitted while employees are working in the Hub.  This means employees will use a spill proof container with a lid and will discretely sip their drink at times that it does not interfere with assisting guests.

**Plants**
All live plants must be inspected at the front Security desk before entering the museum.  Acceptable live plants, including flowers, must come from a commercial florist, to ensure that they are pest-free.

---

## Plagiarism Policy

---

The Buffalo Bill Center of the West strives to emphasize the quality and originality of its employees' contributions to scholarship, as well as its need to continually strengthen and enhance the institution's community.   Plagiarism – the deliberate misappropriation of another's scholarship – damages not only the reputation and standing of the plagiarist, but also, the institution's community and the institution's professional standing.   At the Center, this policy prohibiting plagiarism applies specifically to scholarly writing and public talks of a scholarly nature.

The word plagiarism derives from Latin roots: plagiarius, an abductor, and plagiare, to steal. The expropriation of another author's text, and the presentation of it as one's own, constitutes plagiarism.   It is a serious violation of the ethics of scholarship.

> Plagiarism includes more subtle abuses than simply expropriating the exact wording of another author without attribution.   Plagiarism also includes the limited borrowing, without attribution, of another person's original published or unpublished data, distinctive and significant research findings, hypotheses, theories, rhetorical strategies, mathematical equations and expressions, or interpretations, or an extended borrowing even with attribution. Knowledge is cumulative and in some contexts such as textbooks, syntheses, and encyclopedia articles, the form of attribution, and the permissible extent of dependence on prior scholarship, citation and other forms of attribution will differ from what is expected of more limited monographs. Even in textbooks, a scholar should acknowledge the sources of recent or distinctive findings and interpretation that are not yet a part of the common understanding of the profession.  Scholars should never simply borrow and rephrase the findings of other scholars without appropriate attribution.

Plagiarism takes many forms. The clearest abuse is the use of another's language without quotation marks and citations. Appropriation of concepts, data, or notes disguised as newly crafted sentences, or reference to a borrowed work in an early note and then extensive further use without attribution are more subtle forms of plagiarism.

The first line of defense against plagiarism is the formation of work habits that protect a scholar from plagiarism. Good note-taking requires every researcher to distinguish scrupulously between exact quotation and paraphrase.

Every institution that includes a body of scholars has an obligation to establish procedures designed to clarify and uphold their ethical standards. Every institution that employs scholars bears an especially critical responsibility to maintain the integrity and reputation of its staff.

Usually, it is the employing institution that is expected to investigate charges of plagiarism promptly and impartially and to invoke appropriate sanctions when the charges are sustained. Penalties for scholarly misconduct should vary according to the seriousness of the offense, and the protections of due process should always apply. A persistent pattern of deception may justify public disclosure or even termination of an academic career; some scattered misappropriations may warrant only a formal reprimand.

(Adapted from the American Historical Association's "Statement on Standards of Professional Conduct," approved by its Professional Division, December 9, 2004, and adopted by its Council, January 6, 2005 and conforming with "The Responsible Researcher: Paths and Pitfalls," published by Sigma Xi – The Scientific Research Society, 1999).

To ensure the Center's community upholds and adheres to the highest standards of conduct with respect to safeguarding against plagiarism and preserving the integrity of scholarship, the Center has established the following policy:

1) No member of the Center community will be permitted to engage in plagiarism for any scholarly writing.
2) Complaints of plagiarism must be reported to your supervisor for investigation and/or consultation. If your supervisor is the individual you believe is engaging in plagiarism, report his or her conduct to his superior.
3) An investigation and corrective action, if warranted by the facts, will occur promptly after a complaint is made. There will be no retaliation for bona fide complaints of plagiarism.
4) All managers and supervisors are responsible for assuring this policy is adhered to in their areas of accountability.
5) The executive director is responsible for ensuring that all complaints of plagiarism are investigated and appropriate discipline takes place,

should an employee be found to have engaged in plagiarism as defined by this policy.

## Rules for Visitors

The following rules for visitors, contractors and staff sign-in and admittance to the museum are now in effect. These rules apply to all personnel.

1) **Family members.** All family members of Center employees are required to sign in at a Security desk when visiting the Center at a time the Center is closed to the public or when visiting non-public areas of the Center. The visitor also must wear a Center visitor badge during these times. No one other than individuals with security clearance (staff, volunteers, and certain contractors) will enter the non-public areas of the Center or during closed hours without signing in and out. A staff escort is required for the visitor.

2) **Volunteers, vendors, contractor and construction personnel.** Frequent visitors to the Center must also sign in at the front desk and wear a visitor badge. The security guard will call the host employee, who will have to escort the visitor in.

3) **Contractors/service technicians.** Long-term contractor personnel to include electricians and plumbers will be issued photo IDs and will be required to wear them while in the building.

4) **All Staff.** Under normal circumstances, all staff of the Center will enter and exit the building through the employee entrance at the south loading dock. This entrance shall be open to all employees and volunteers daily on a year-round basis from 7:00 A.M. to 6:00 P.M.

If you plan to come in after hours or on the weekends, you should call ahead. The security guards on duty have tasks they must perform while working and aren't always at Base 1. If you don't call, you may have to wait until security returns to Base 1 before the back door can be released. When you arrive at the Center, you must enter through the back door only, unless the museum is open to the public at which time you may enter through the front door. As you enter, you must sign in. This creates a record of staff who visit the building outside their normal working hours. There are sign in sheets at the Base 1 and Base 2.

## Safety Procedures

**Evacuation Procedure**

In advance, each staff person, and volunteer should:

1) Understand this evacuation plan.
2) Recognize the sound of the evacuation alarm.
3) Know at least **two** ways out of the building from your regular work space.

4) Always know where you are in the building and look for emergency exits from spaces other than your work space.

**Alertus System**

Alertus is an emergency alert system connected to our computer network. In the case of an emergency (for example, severe weather or an active shooter), the Security Department activates Alertus. The system takes over all active computer monitors in the building, displaying a written warning and instructions, and sounding an audible alarm.

**When you hear the evacuation alarm or are told to evacuate the building:**

1) Remain calm.
2) Immediately shut down all hazardous operations.
3) Leave quickly but in a controlled manner.
4) The highest ranking person who is physically present in each department is responsible for insuring that all members of his/her department evacuate the area. In addition, every employee should check that all others in that work space are leaving as instructed.
5) As you exit, quickly check nearby restrooms, copier rooms, closets, etc.
6) Accompany and help disabled persons, and any co-worker who appears to need calm direction or assistance.
7) Take with you your car keys, handbag, briefcase, etc. Do not attempt to take large or heavy objects.
8) Shut but do not lock all doors behind you as you go. Closed doors can slow the spread of fire, smoke and water.
9) Proceed as quickly as possible, but in an orderly manner. Do not push or shove. Hold the handrail when you are walking on the stairs.
10) Once out of the building, move away from it.
11) Go to the staff assembly area, which is the grassy area across the roadway from *The Plainsman* sculpture. Do not stand in the driveway or roadway.
12) All staff and volunteers must be accounted for promptly. Assist your department head or alternate in getting a complete head count of your department. Do not re-enter the building if someone is missing but notify the Security Department. Remain in the assembly area until assigned to emergency duties or instructed to leave.

**POWER OUTAGE**

The Center has several emergency generators that provide emergency lighting and other power to many areas, including the galleries, stairways, and much of the basement. All other gallery space has battery operated emergency lights mounted near all exit paths.

**If a power outage occurs:**

1) Remain calm.
2) Provide assistance to visitors and staff in your immediate area.
3) **In the Museum:** Security Officers will move through all public spaces with flashlights, escorting visitors to safety. Security also will secure all galleries and art storage areas from vandalism, intrusion and fire.

4) If you are in an unlighted area, proceed cautiously to an area that has emergency lights.
5) If you are in an elevator, stay calm. Use the intercom or the emergency button to notify the Security Department.
6) Move to an area that has enough natural light to be a safe area to occupy.

## FIRE

### If a fire occurs in your area:

1) If the fire does not threaten your personal safety, call the Security Department at extension **4057** or **4212 IMMEDIATELY**.
2) Do not call the Fire Department yourself.
3) Remain calm.
4) If the fire is small, attempt to put it out with a fire extinguisher. **Do not jeopardize your personal safety. Do not enter smoke in order to extinguish the fire.**
5) Never allow the fire to come between you and the exit.
6) Disconnect electrical equipment that is on fire **if it is safe to do so.** (Pull the plug or throw the circuit breaker).
7) Notify your supervisor of the location and extent of the fire.
8) **Evacuate your area and everyone in it if** you are unable to put out the fire. Close but do not lock the doors behind you to confine the fire. Go to the staff assembly area outside the main entrance to the Center.
9) Do not break windows **unless needed to escape the fire.** Oxygen feeds a fire.
10) Do not open hot doors. Before opening any door, touch it near the top. If the door is hot or if smoke is visible, **do not open the door.**
11) Do not attempt to save possessions at the risk of personal injury.
12) Do not return to the emergency area until instructed to do so by Security Department personnel.
13) Do not use elevators unless assisting disabled persons.
14) **All fires, no matter how small, must be reported to the Security Department.**

## Security

The physical security of the building, its collections and the people within the building is a full-time job for the Security Department. It is also a full-time consideration for every employee.

1) **General Staff Responsibilities:** Take security seriously. Ensure that your business guests, colleagues and other visitors sign in and are wearing the proper identification. Make sure that they are escorted throughout the museum complex during times when the galleries are closed.

2) **Building Access:** Normal hours of operation: Hours for the main entrance door to be open match the hours the Center is open to visitors. These hours

vary by season.  The Center reserves the right to inspect any and all bags or packages carried in or out of the building, at any entrance. All bags and packages carried by employees entering or exiting the building will be inspected.

3) **After-Hours Access Policy:**  Under normal circumstances, all staff of the Center will enter and exit the building through the employee entrance at the south loading dock. This entrance shall be open to all employees and volunteers daily on a year-round basis from 7:00 A.M. to 6:00 P.M.

- If a staff member plans to come in at other times, the staff member must call in advance, as described in Rules for Visitors.
- During the hours the Center is open to the public, staff members may access the building at the front door the same way as any visitor provided they do not need their keys and ID or need access to any non-public spaces.
- Every staff member must sign in, at either entrance, whenever entering the building outside of their normally assigned working hours.
- Staff members who are regularly scheduled outside of the employee entrance hours, will not be required to call in advance.
- Staff members directly involved with special activities, entering the building for a scheduled event, will not be required to call in advance. If a visitor enters after normal business hours, all of the above applies. That person must be accompanied at all times by a staff member.
- The Security Officer on duty may not accept an after-hours delivery unless it is approved by Administration in advance. If approval is given, a written notification must be supplied to Base 1.
- The Center reserves the right to inspect any and all bags or packages carried in or out of the building, at any entrance. All bags and packages carried by employees entering or exiting the building will be inspected.

4) **Card Key Control**

Employees of the Center are issued a card key along with access codes.  The card key will access specified card key locks; however, for some areas the appropriate digital code must also be entered before the locks will function. Under such a system locks may be reprogrammed on a periodic or necessary basis. The Security Officer will swipe the card key when the employee arrives and when the employee departs. The badges remain with the Security Department when the employee leaves the building.

In the event of loss of a card key, please report the incident and the circumstances to the security office immediately so that appropriate steps may be taken.

## Sexual Harassment Policy

The legal definition of sexual harassment is:
Sexual advances, requests for sexual favors, and verbal or physical conduct of a sexual nature when:

1) Submission to, or rejection of, such advances, requests or conduct is made either explicitly a term or condition of employment or a basis for employment decisions; or
2) Such advances, requests or conduct have the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment.

Under these definitions, direct or implied requests by a supervisor for sexual favors in exchange for actual or promised job benefits such as favorable reviews, salary increases, promotions, increased benefits, or continued employment constitutes sexual harassment.

The legal definition of sexual harassment is broad. In addition to the examples above, other sexually oriented conduct that, whether intended to be or not, is unwelcome or has the effect of creating a workplace environment that is hostile, offensive, intimidating or humiliating to male or female employees may also constitute sexual harassment. Workplace environment includes all company sponsored events that are on and off the regular work site.

While it is not possible to list all of the circumstances that may constitute sexual harassment, the following are some examples of conduct that, if unwelcome, may constitute sexual harassment depending upon the totality of the circumstances, including the severity of the conduct and its pervasiveness:

- Unwelcome sexual advances – whether or not they involve physical touching;
- Sexual epithets, jokes, written or oral references to sexual conduct, gossip regarding one's sex life, comments on an individual's body, comments about an individual's sexual activity, deficiencies or prowess;
- Displaying sexually suggestive objects, pictures, cartoons;
- Unwelcome leering, whistling, brushing against the body, and sexual gestures;
- Suggestive or insulting comments;
- Inquiries into one's sexual experiences;
- Discussion of one's sexual activities.

**No Retaliation**
All employees should take special note that retaliation against an individual who has filed a bona fide complaint about sexual harassment or who has cooperated with an investigation of a sexual harassment complaint is unlawful and will not be tolerated by the Center.

## Complaint Procedure

If any employee believes that he or she has been subject to sexual harassment, the employee must report it in writing to the Human Resources Manager and his or her immediate supervisor.  If either one of these individuals is the one you believe is harassing you, only report it to one.

These persons are available to discuss any concerns an employee may have to provide information about the company's policy on sexual harassment and its complaint procedures.

## Investigation

When the Center receives notice of conduct that appears to be sexual harassment, it will promptly investigate the allegation in a fair and expeditious manner.  The investigation will be conducted in such a way as to maintain confidentiality to the extent practicable under the circumstances and permissible by law.

## Appropriate Response/Disciplinary Action

If it is determined that an employee has been engaged in inappropriate conduct, appropriate action will be taken immediately to fulfill the company's obligation under the law to promote a workplace that is free of sexual harassment.  Such action may range from discussion/counseling to termination of employment, and may include other forms of disciplinary action appropriate to the circumstances.

## Values

### Our Core Values

The concepts embodied in the Code of the West are expanded in the Values Statement approved by the Board of Trustees as part of our Strategic Plan.  The Core Values embody the essence of what we strive to do in all of our activities.

■ Creativity – Infusing everything we do with imagination, sensitivity, and renewal

■ Authenticity – Offering visitors and our community experiences based in the real, the genuine, and the original

■ Integrity – Embracing honesty and openness in history, culture, scholarship, and all our actions with visitors, donors, supporters and one another

■ Collaboration – Working creatively with institutions, organizations, and individuals who share our passion and commitment in telling the story of the American West
The Center codifies these statements as the guiding principles of our Ethics Policy.

## Vision Statement

The Buffalo Bill Center of the West will secure and expand its reputation as the

world's foremost authority on and interpreter of the American West.

## Weapons and Threats of Violence

The purpose of this policy is to prohibit weapons or the verbal threat of the use of weapons, intimidation or violence.

Buffalo Bill Center of the West employees shall not possess firearms or any other dangerous weapons of any type in the workplace, Center vehicles or buildings owned and/or managed by the Center. This prohibition applies even though an individual may be licensed in his/her private capacity to carry a concealed weapon. In addition, any other related object carried for the purpose to injure or intimidate others is not permitted in the workplace, Center vehicles, or Center buildings unless otherwise authorized by the Security Department of the Center.  Firearms or other dangerous weapons shall include, at a minimum:

> Pistols, revolvers, shotguns, rifles, and the like; dangerous knives (any fixed-blade knife or any knife, regardless of its type, having a blade length of greater than 4 inches measured from the point where the knife blade meets the knife handle to the tip and also includes any Balisong knife or switchblade knife) not necessary in the performance of work duties; explosive devices of any kind; sling shots, nunchaku sticks, and the like; clubs, sand clubs, throwing stars, and the like; metal knuckles; air guns, pellet guns, blow guns; dirks, daggers, and similar knives fitted for stabbing; any replica or other item that simulates any of the above items.

An exception to the above policy shall be made for the scholarly examination and assessment of weapons in the custody of employees, by the Cody Firearms Museum curatorial staff, provided advance notice of bringing the weapon is made and the employee bringing the weapon complies with the procedures for this examination and assessment.  Those procedures are:

1) Employees should notify Security at 578-4057 (Base 1) when they intend to bring in weapons for examination and assessment;
2) Weapons that use ammunition should not be loaded;
3) All weapons are to be logged in at Base 1 when brought into the Center by an employee;
4) All weapons are to be logged out when leaving the premises.

Exceptions may also be made on a case-by-case basis for personal weapons stored in Center owned or controlled facilities for which the employee has a rental or lease agreement with the Center. Also, exceptions may be granted when the circumstances warrant an exception, for couriers using Center vehicles to transport loans, donations or traveling exhibits.  The exceptions noted in this paragraph require the approval of the Security Manager.

Center employees are prohibited from engaging in any violent behavior towards others, with the exception of Security Officers who are acting in an official capacity. Any physical, verbal or visual act (with or without a weapon) that threatens, attempts to intimidate, creates fear, or has the purpose of unreasonably interfering with an individual's work performance, creates an intimidating, hostile or offensive work environment is prohibited. This includes aggressive or hostile behavior, intentionally damaging property; committing acts motivated by, or related to, workplace harassment or domestic violence. This includes, but is not limited to, aggressive or hostile behavior, intentionally damaging property, and threatening another person either verbally or with a weapon.

## Whistleblower's Policy

### General

Buffalo Bill Center of the West (Organization) Code of Ethics and Conduct ("Code") requires directors, officers and employees to observe high standards of business and personal ethics in the conduct of their duties and responsibilities. As employees and representatives of the Organization, we must practice honesty and integrity in fulfilling our responsibilities and comply with all applicable laws and regulations.

### Reporting Responsibility

It is the responsibility of all directors, officers and employees to comply with the Code and to report violations or suspected violations in accordance with this Whistleblower Policy.

### No Retaliation

No director, officer or employee who in good faith reports a violation shall suffer harassment, retaliation or adverse employment consequence due to making the report. An employee who retaliates against someone who has reported a violation in good faith is subject to discipline up to and including termination of employment. This Whistleblower Policy is intended to encourage and enable employees and others to raise serious concerns within the Organization prior to seeking resolution outside the Organization.

### Reporting Violations

Employees should share their questions, concerns, suggestions or complaints with someone who can address them properly. In most cases, an employee's supervisor is in the best position to address an area of concern. However, if you are not comfortable speaking with your supervisor or you are not satisfied with your supervisor's response, you are encouraged to speak with someone in the Human Resources Department or anyone in management whom you are comfortable in approaching. Supervisors and managers are required to report suspected violations of the Code of Conduct to the Organization's Compliance Officer, who has specific and exclusive responsibility to investigate all reported violations. For suspected fraud, individuals should contact the Organization's Compliance Officer directly.

### Compliance Officer

The Organization's Compliance Officer is responsible for investigating and resolving all reported complaints and allegations concerning violations and, at his discretion,

–39–

shall advise the Executive Director and/or others on the Audit, Compliance and Risk Management Committee. The Compliance Officer has direct access to the audit committee of the board of directors and is required to report to the audit committee at least annually on compliance activity. The Organization's Compliance Officer is the chair of the audit committee.

| Wallace Johnson | 3141 Southfork Rd. |
|---|---|
| General Counsel, Board of Trustees | Cody, WY 82414-2835 |
| Trustee | 307-587-5061 |
| waldon@vcn.com | 307-899-3743 (cell) |

## Accounting and Auditing Matters
The Audit, Compliance and Risk Management Committee of the board of directors shall address all reported concerns or complaints regarding corporate accounting practices, internal controls or auditing. The Compliance Officer shall immediately notify the audit committee of any such complaint and work with the committee until the matter is resolved.

## Acting in Good Faith
Anyone filing a complaint concerning a violation or suspected violation of the Code must be acting in good faith and have reasonable grounds for believing the information disclosed indicates a violation of the Code.  Any allegations that prove not to be substantiated and which prove to have been made maliciously or knowingly to be false will be viewed as a serious disciplinary offense.

## Confidentiality
Violations or suspected violations may be submitted on a confidential basis by the complainant or may be submitted anonymously. Reports of violations or suspected violations will be kept confidential to the extent possible, consistent with the need to conduct an adequate investigation.

## Handling of Reported Violations
The Compliance Officer will notify the sender and acknowledge receipt of the reported violation or suspected violation within five business days.  All reports will be promptly investigated and appropriate corrective action will be taken if warranted by the investigation.

Audit Committee Compliance Officer
Buffalo Bill Center of the West Management Staff

This sample may used for non-commercial use by nonprofit organizations with the following attribution:

Copyright 2004, National Council of Nonprofit Associations, www.ncna.org.



EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | [X] FEPA | 32K-2020-00037 |
| | [X] EEOC | 32K-2020-00037 |

| Wyoming Fair Employment Program | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| **Ms. Bonnie L. Smith** | **(310) 308-2390** RECEIVED | |
| Street Address     City, State and ZIP Code | | |
| **1231 Chalk Road, Powell, WY 82435** | JAN 0 2 2020 | |
| | LABOR - CHEY | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **BUFFALO BILL MEMORIAL ASSOCIATION** | **201 - 500** | **(307) 578-4089** |
| Street Address     City, State and ZIP Code | | |
| **D/B/A Buffalo Bill Center Of The West,  720 Sheridan Avenue,  Cody, WY 82414** | | |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |
| Street Address     City, State and ZIP Code | | |
| | | |

| DISCRIMINATION BASED ON *(Check appropriate box(es).)* | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| | Earliest          Latest |
| [ ] RACE  [ ] COLOR  [X] SEX  [X] RELIGION  [ ] NATIONAL ORIGIN | **05-01-2018     03-28-2019** |
| [X] RETALIATION  [X] AGE  [ ] DISABILITY  [ ] GENETIC INFORMATION | |
| [ ] OTHER *(Specify)* | [ ] CONTINUING ACTION |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

**PERSONAL HARM**: I was subjected to harassment and intimidation. I was subjected to different terms and conditions of employment. I was discharged.

**RESPONDENT'S REASON FOR ADVERSE ACTION:**  Complaints from others, not staying in my lane, and insubordination.

**DISCRIMINATION STATEMENT**:  I believe I was discriminated against on the basis of my sex, female, my age, 52 _____, my religion, Other, and retaliated against in violation of the Title VII of the Civil Rights Act of 1964, as amended, and the Age Discrimination in Employment Act of 1967, as amended. Specifically:

1. I am a member of the protected groups, female, over the age of forty, and religion (Other);
2. I was satisfactorily performing my job;
3. I was subjected to sex, age, and religious harassment;
4. The harassment complained of affected a term, condition, or privilege or employment and was so pervasive as to alter the working conditions of employment and create an abusive working environment;
5. I was subjected to different terms and conditions of employment;
6. Other similarly situated employees outside my protected groups were not subjected to similar terms and conditions of employment in similar circumstances;

Exhibit 2

7. I engaged in protected opposition to Title VII prohibited discrimination;
8. Contemporaneous with or subsequent to my protected activity I suffered an adverse employment action;
   a. I was discharged on March 28, 2019.
9. There exists a causal connection between my protected activity and my employer's decision to take adverse employment action against me; and
10. My name may be used in the processing of this charge.

NIKKI FLOWERS          NOTARY PUBLIC
COUNTY OF              STATE OF
PARK                   WYOMING
MY COMMISSION EXPIRES MAY 18, 2020

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |

12/30/19   Charging Party Signature

Date

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(month, day, year)

 12/30/19